[Civ. No. 11781.  Second Appellate District, Division One.—January 18, 1940.]

J. F. KATENKAMP et al., Respondents, v. UNION REALTY COMPANY (a Corporation), Appellant.

[Civ. No. 11783.  Second Appellate District, Division One.—January 18, 1940.]

J. F. KATENKAMP et al., Respondents, v. UNION REALTY COMPANY (a Corporation), Appellant.

Heaney, Price, Postel & Parma for Appellant.

Leland Crawford and Alfred W. Robertson for Respondents.

WHITE, J.—The two actions forming the basis of this appeal involve the construction by defendant of two groins into the water fronting its properties upon the westerly arm of Miramar Bay in Santa Barbara County. Defendants' real property is situated just east of the city of Santa Barbara, consisting of approximately 1200 feet fronting the Pacific Ocean. Plaintiffs' properties also border on the Pacific Ocean and are situated east of defendant's property. Two groins are here involved, one known as the easterly groin, which is 300 feet long, and one known as the westerly groin having a length of 190 feet. The easterly groin is closest to the plaintiffs' properties, while the westerly groin is distant 200 feet west of said easterly groin. The easterly groin was built and completed in the early summer of the year 1925,

while the westerly groin was constructed early in the summer of 1929, at which last-named time the easterly groin was capped, raised slightly in height and connected to the shore. In the *interim* between the erection of the easterly and westerly groins, viz., August, 1927, the city of Santa Barbara commenced construction of a breakwater for the purpose of providing a yacht harbor. This breakwater was approximately 3½ miles west of the properties of the respective parties to this litigation. Construction of the breakwater continued into the year 1928 and until the fall of 1929, when it was completed.

By their amended complaint plaintiffs allege that following the erection of the second groin and the capping of the original groin in 1929, natural currents of the sea were changed, causing sands in suspension to be deposited along and to the west of defendant's groins and the currents to carry away and erode plaintiffs' properties. Plaintiffs claimed that when their property commenced to erode the sands were carried away, leaving exposed the underlying rocks and clay; all of such conditions, it was charged, resulted from the groins constructed by defendant.

The two actions here in question were filed September 29, 1932, and October 5, 1932, one being an action for a mandatory injunction demanding removal of the groins, and the other being for damages allegedly resultant from the erection and maintenance of said groins. Following the sustaining of demurrers to the amended complaint and the entry of judgments thereon in favor of defendants, both such judgments were reversed by the appellate courts, and the causes remanded for trial. (6 Cal. (2d) 765 [59 Pac. (2d) 473] and 11 Cal. App. (2d) 63 [53 Pac. (2d) 387].) Upon the coming down of the *remittitur* in each action, defendant filed its answers, and the matters came on for trial, following which judgment was entered June 20, 1937, in favor of plaintiffs, decreeing that a mandatory injunction issue commanding defendant forthwith to permanently remove the two groins in question from in front of plaintiffs' property, while in the second action plaintiffs were respectively awarded damages in various sums totaling $4,200. By stipulation both actions were tried together, but separate findings and judgments were entered. While separate appeals were taken by

the defendant, it has been agreed that the cases may be considered together upon a consolidated set of briefs.

In addition to its denial of the allegations contained in plaintiffs' amended complaint, defendant set up the following affirmative defenses; summarized in appellant's brief as follows:

"(a) That the groins are maintained for the purpose of protecting the property of appellant, its said property being exposed to the inroads of the sea and thus to erosion.

"(b) As to the action in damages—that the action is barred by paragraph 2 of section 338 of the Code of Civil Procedure of the State of California.

"(c) As to the injunction suit—that it would be inequitable to order the removal of the groins or any part thereof because any benefits resulting to respondents would be slight and the damage to appellant's property, great; that the damages to appellant's property would far offset any possible benefits respondents might receive, and that the remedy of injunction would therefore be harsh, inequitable and unjust."

The general grounds of appeal, therefore, are epitomized by appellant in its brief as follows:

"1. Was appellant within its rights in maintaining said groins, even if respondents' properties were thereby damaged, or in other words, do the facts in this case warrant the application of the common enemy rule?

"2. Does the evidence show any recoverable damage to have been caused by the groins?

"3. Does the evidence show what portion of recoverable damages, if any, was caused by appellant's groins?

"4. Is the action in damages barred by the provisions of paragraph 2 of section 338 of the Code of Civil Procedure of the State of California?

"5. Would it be inequitable, under the circumstances, to order the removal of said groins or a portion thereof?"

■ In support of its first ground of appeal, appellant asserts that because its land borders on the seashore and is exposed to the inroads of the sea, it has a right to use and did use only reasonable means for its protection; that by reason of what is commonly characterized as the "common enemy doctrine" it is not accountable to an adjacent littoral owner for injuries occasioned thereby. The doctrine referred to found its first pronouncement in England about the year

1828, in the case of *Rex* v. *Commissioners of Sewers, etc.*, 8 Barn. and C. 355 (1828). In the cited case it appears that the commissioners, in order to protect certain lands which it was their duty to protect, erected certain groins, some of which, it was charged, caused the sea to flow with greater violence against the lands of one Cosens, thereby making a greater inroad upon such land than the sea would otherwise have done. The opinion of the court, delivered by Lord Tenterden, C. J., and Bayley, J., denying the *mandamus* prayed for against the commissioners, proceeds in part as follows:

" . . . It may be conceived that such is the effect of the groyne" (causing the sea to make a greater inroad upon the land than possibly it might otherwise have done); "but the sea is a common enemy to all proprietors on that part of the coast, and I cannot see that the commissioners, acting for the common interest of several land-owners, are, as to this question, in a different situation from any individual proprietor. Now, is there any authority for saying that any proprietor of land exposed to the inroads of the sea, may not endeavor to protect himself by erecting a groyne or other reasonable defence, although it may render it necessary for the owner of the adjoining land to do the like? I certainly am not aware of any authority or principle of law which can prevent him from so doing. If we were in this instance to say that the commissioners for the level in question were bound to erect a groyne for Mr. Cosens, it might, and probably would, cause injury to the land lying to the eastward in the same manner as that erected for the protection of the level has caused injury to Mr. Cosens and the owner of the land lying eastward of Mr. Cosens would have a right to call upon the commissioners to protect him also. In like manner each successive proprietor of land lying to the eastward would be entitled to claim protection, and the commissioners might be compelled to erect defences against the sea along the whole line of coast from the level of Pagham to the North Foreland; for so far, I believe, the sea is making inroads upon the land. The extent to which the principle must be carried, if once admitted, satisfies me that it cannot be sustained in reason or in law. I am, therefore, of opinion that the only safe rule to lay down is this, that each land-owner for himself, or the commissioners acting for several land-owners, may

erect such defences for the land under their care as the necessity of the case requires, leaving it to others, in like manner, to protect themselves against the common enemy. For these reasons, the rule for a *mandamus* must be discharged.''

To the foregoing Bayley, J., added by way of concurrence:
'' . . . But if they'' (the commissioners) ''act *bona fide,* doing no more than they honestly think necessary for the protection of the level, their acts are justifiable, and those who sustain damage therefrom must protect themselves. It has been argued that Mr. Cosens, having sustained damage from the groyne erected by the commissioners, is entitled to compensation. I do not agree to that as an abstract proposition. If a man sustains damage by the wrongful act of another, he is entitled to a remedy; but to give him that title those two things must concur, damage to himself, and a wrong committed by the other. That he has sustained damage is not of itself sufficient. Now here Mr. Cosens may have sustained damage, but the commissioners have done no wrong. The *dictum* of Mr. Justice Wilmot was cited to show that where there is a right this Court ought to find a remedy. But the right that Mr. Cosens and each land-owner has, is to protect himself; not to be protected by his neighbours. To that right no injury has been done, nor can any wrongful act be charged against the commissioners; the court, therefore, have no grounds for granting the *mandamus* applied for.''

The doctrine just enunciated was followed in the early California case of *Lamb* v. *Reclamation Dist. No. 108,* 73 Cal. 125 [14 Pac. 625, 2 Am. St. Rep. 775], where it was sought to abate and remove as a public nuisance a levee erected along the west bank of the Sacramento River and to recover damages for the overflowing of plaintiff's land on the other side of the river, about two miles below, allegedly caused by said levee. In this case our Supreme Court quotes extensively and approvingly from the decision in the case of *Rex* v. *Commissioners of Sewers, etc., supra,* in which latter case the waters of the sea were characterized as a common enemy against which every man has a right to defend himself. See, also, *Sanguinetti* v. *Pock,* 136 Cal. 466, 473 [69 Pac. 98, 89 Am. St. Rep. 169]; *McDaniel* v. *Cummings,* 83 Cal. 515, 520 [23 Pac. 795, 8 L. R. A. 575]; *Jones* v. *California Dev. Co.,* 173 Cal. 565, 574 [160 Pac. 823, L. R. A.

1917C, 1021]; *Le Brun* v. *Richards*, 210 Cal. 308 [291 Pac. 825, 72 A. L. R. 336].

The principle underlying the foregoing decisions which deal with extraordinary water conditions is that under such stress the landowner may use every precaution not unreasonable to avert damage to his land. Whether such owner's conduct is reasonable must be determined by existing conditions and not by consequences which follow. Respondents seek to distinguish the above-cited cases and assert their inapplicability upon the ground that the California cases cited refer only to storm waters, and that the tide waters of the Pacific Ocean are not storm waters in any sense. Be that as it may, the cases cited confirm the holding in the early English case of *Rex* v. *Commissioners of Sewers, etc., supra,* that the sea is a common enemy and whenever it attacks littoral property the owner thereof may protect his property from its ravages and use every reasonable means so to do without liability.

With this principle in mind, we now turn to the record to ascertain whether, under the circumstances shown to exist here, the actions of the defendant were, as contended for by plaintiffs, unreasonable and therefore subject to abatement and responsibility for damages inflicted upon the property of plaintiffs. In determining the reasonableness of appellant's conduct, we are brought to a consideration of whether the erection and maintenance of the groins were and are a necessary protection from the inroads of the sea.

Appellant acquired its properties here in question in 1924. At that time there were no structures on this property fronting the ocean except a house known as the Bark House. In 1925 appellant built the first groin, at a cost of $5,786.25. That such groin proved effective for preventative purposes against ravages of the sea is evidenced by the fact that in 1927 appellant built bathhouses upon its property at a cost of $5,838, and in 1928 erected food booths upon the property at a cost of several thousand dollars. Up to this time in 1929 there is no claim on the part of respondents that their properties were damaged by the first groin erected in 1925, nor is there any evidence that appellant's beach club or its appurtenant bathhouses and food booths were damaged by the ocean waters after their erection following the installation of the groin in 1925 up to the time of the erection of the

second groin in 1929. Under this state of the record, there were sufficient facts in evidence to sustain the court's finding that no necessity existed, so far as protection of appellant's property from the inroads of the sea is concerned, for the raising of the height of the 1925 groin and the erection of the additional groin in 1929. As to the causal connection between the erection of the groin in 1929 and the damage to respondents' properties, the record contains evidence that prior to June, 1929, the ocean front of plaintiffs' property was covered with a sandy beach to a depth of approximately six feet of sand; that since June, 1929, said sands have disappeared from plaintiffs' property, leaving exposed the underlying rocks, and in places exposing beds of clay beneath the sands and rocks; also, that the ordinary high tide line of the waters of Miramar Bay has encroached upon plaintiffs' properties to a varying distance of from 30 to 60 feet. Indicative of the relative condition of the area included in the respective properties of plaintiffs and defendant prior to the erection of the groins is, the following testimony given by Thomas Dinsmore, supervisor of the first district of Santa Barbara County, whose familiarity with the shore in question extends back sixty years:

"Q. Calling your attention to Plaintiffs' Exhibit Number 9, are you familiar with the point shown here as 'Fernald Point'? A. I am.

"Q. Have you frequently observed that point? A. Yes.

"Q. And prior to the erection of any groins? A. Yes.

"Q. Please state to the Court the condition of the shore there prior to the erection of groins. A. That point was always rocky around that Fernald Point.

"Q. Calling your attention to the portion of the property marked on this exhibit as 'Union Realty Company property', are you familiar with that property? A. I am.

"Q. And were you familiar with it prior to the erection of any groins on there? A. I was.

"Q. Will you state to the Court, as you recall the condition of that property prior to the erection of the groins? A. The same condition. There was a rocky point that runs out there.

"Q. Calling your attention to the portion of the property shown on this map, commencing at Eucalyptus Lane and Miramar Pier. (Plaintiffs' property.) The area in

there. Do you know what that area was called? A. What do you mean, 'area'?

"Q. That area shown on this map between the Union Realty Company property, Eucalyptus Lane, and Miramar Pier. A. That was known as Miramar Beach there.

"Q. Will you state to the Court the condition of the property prior to the erection of any groins upon the Union Realty Company property? A. There was always a wide beach there prior to that."

As to what change occurred in plaintiffs' properties after the erection of the second groin and the capping of the first in June, 1929, John Frederick Katenkamp testified as follows:

"Q. Just explain what you observed physically. A. I observed the sand under Mrs. Katenkamp's cottage also being washed away, and that our beach was being denuded of sand.

"Q. Will you explain more fully what, if anything, you observed as to the other properties? A. In proportion this happened to the properties situated toward the east.

"Mr. Rogers: I move to strike out the answer as stating the opinion and conclusion of the witness.

"The Court: Denied.

"Q. When did you first observe this condition, Mr. Katenkamp? A. It became very apparent in July of 1929.

"Q. Continuing on during the year 1929, what did you observe? . . .

"Q. Just explain, then, what you observed. A. I observed the sand beach disappearing and noticed rocks appearing instead.

"Q. With reference to Plaintiffs' Exhibit No. 10, will you please go to the map and with a K6 indicate the point you first observed rocks appearing and approximately when? Approximately what period in 1929 did you make that observation? A. From the month of July on—about the middle of July.

"Q. When did you first observe the rocks appearing, Mr. Katenkamp? A. At that time.

"Q. Did rocks appear right away as soon as the groin was completed? . . .

"The Court: It is leading. Sustained.

"Q. During the year 1930, you were on the beach, were you, during that year? A. Except for two months in the spring.

"Q. And what months were they? A. About the fifteenth of April to the fifteenth of June.

"Q. During the year 1930, with the exception of those two months, how frequently were you on the beach at Miramar Bay? A. At least two or three times a day.

"Q. Will you state to the Court what you observed during the year 1930 upon Miramar Bay, at the properties at the foot of Eucalyptus Lane shown on plaintiffs' Exhibit No. 10, extending easterly along the shore? A. I observed our beach was disappearing more and more.

"Q. Did that occur all the way through 1930? A. Occasionally we would have a reversal of weather conditions, but as a rule the beach continued to disappear.

"Q. During the year 1931? . . .

"Q. I will ask the witness what he observed, if anything, during the year 1931 upon the shore immediately east of the easterly Edgecliff groin? A. I observed a rather marked increase in the erosion directly east of the Edgecliff groin and a continuous disappearance of our beach further east.

"Mr. Rogers: I move to strike out the statement as to the erosion as stating the conclusion of the witness.

"The Court: You mean the disappearance of sand? A. No, now the bluff was being attacked.

"The Court: Did the beach itself disappear? A. The rock beach remained, but the sand disappeared.

"The Court: Objection overruled.

" . . .

"Q. During the year 1932, what was the condition of this area you have just described? A. Just about the same, with the damage increasing except for one period.

"The Court: You can't testify as to damage. A. The erosion increased every year except for a short period about August, 1932, when a considerable quantity of sand collected itself on the eastern end of Miramar Bay between the easterly groin and the pier.

"Q. During 1933 what was the condition, Mr. Katenkamp? A. The same.

"Q. Has that continued up to the present time? A. Yes, sir.

" . . . "

Further, Dr. U. S. Grant, assistant professor of geology at the University of California, testified that he had made a special study of shore line processes and shore line phenomena; that he is acquainted with and had made a personal examination of the areas here in question; that in his opinion, if the breakwater had not been built "there would have been possibly, surely, a larger amount of sand drift eastward along these beaches, but nevertheless I think the groins would act like most groins under similar conditions and would tend to deflect seaward the longshore drift". This witness further testified:

"By the Court: Q. I would like to ask a question or two. As I understand you, Doctor, you stated in your opinion that this breakwater has some effect in depriving this land here of sand? A. Yes, your Honor. I believe that the breakwater has had an effect on this whole general region over to as far and including Summerland.

"Q. Part of the beach here apparently had no sand; how about that? A. Where it had no sand, then the effect is not noticeable. The effect is to reduce the amount of sand available in this region here, but not to cut off the entire supply.

"Q. What makes you think this land was deprived of sand by reason of the breakwater? How did you reason it out? A. It is apparent that since the breakwater has been built, there has been an increase in the width of the beaches in this general region, and it seems to me that there has been a very decided effect. . . . "

With reference to the relative responsibility of the groins and the breakwater, the court propounded to Dr. Grant the following interrogatory:

" . . . I want to know what in your opinion is the proportion of the damage done by the groins with reference to the proportion done by the breakwater."

To which the witness responded: "For the region immediately east of the groin I believe that groin is responsible for the larger effect, say 75 per cent. I would rather not state figures, but I believe it is true in general where we have a groin of this nature, especially where it projects

out from the coast in the manner that it does, that we are apt to have a rather serious lack of sand on the lee side, and that is true here."

In opposition to the foregoing, and in support of its claim that the groins were necessary in order to protect its property from the encroachments of the sea, defendant introduced testimony of which the following *résumé* is typical:

Charles F. Leeds, a consulting engineer of unquestioned standing and unchallenged education, training and experience, testified that he became familiar with the defendant's property in 1923; that along this property the shore was usually covered with cobbles; that there was some sand there, but he could not say how much; that in 1924 they constructed some experimental groins at Edgecliff; that the president of defendant, Union Realty Company, stated that he wanted the property protected, so plans were prepared for two groins and permits for their construction were obtained. This witness testified that the purpose of the groins was to demonstrate whether they could protect the property. He testified he saw the property frequently after that, and in 1925 a further study was made, when a design was worked out and a permit obtained for what is in the instant case known as the easterly groin. The old groins were allowed to disintegrate. The groin constructed in 1925 was a concrete box which was filled with boulders, and extended 262 feet. The witness further testified that the sand began to collect almost as soon as the construction was undertaken, and it was filled up to the top in a matter of three or four days; that sand was going over the top of the groin even at that time; that after the groin filled up sand actually went over the top of the groin. In 1929 it was decided to increase the protection, and a groin was constructed to the west. The easterly groin was given a concrete cap on the shoreward portion. This cap was constructed for a distance of approximately 170 feet from the shoreward end. Mr. Leeds further testified that the groins at Edgecliff do not deflect the sands seaward; that as a matter of fact there is a tendency very slight, to deflect the sands shoreward.

With reference to the breakwater at Santa Barbara and its effect upon the beach, Mr. Leeds testified that after the breakwater was constructed there was a good sandy beach

over the area from Santa Barbara Point to Carpinteria. With reference to the cause of the erosion complained of by plaintiffs, this witness testified that the cause of the erosion on all of these easterly beaches is the damming of the littoral drift by the breakwater. In this connection his testimony, as epitomized by appellant, was in part substantially as follows:

"It is the breakwater which is the cause of the erosion. This is shown by the amount of sand impounded within the breakwater area and the fact that the accretion west of the breakwater was practically simultaneous with the erosion of the easterly beaches. As the accretion at the breakwater increased in size there was progressively a deterioration of the easterly beaches—not a regular progression, but continuous throughout the time since the breakwater was started. . . . Since the groins have become full originally they have had no effect on the property easterly. . . . These high tide lines further show that the groins have had no effect, because if the groins had affected it there would have been a particular point of greater divergence. . . . In his opinion the groins have not caused any erosion to the property east since the capping of the easterly groin, because he has seen sand passing over the groin and, knowing the height to which it was built, sand would pass over in sufficient quantities to maintain the beach if the supply from the west had not been cut off. . . . After the capping of the easterly groin he recalls no noticeable deterioration of the beaches until about a year after. . . . The closing in of the breakwater resulted in the shutting off of the supply of sand and the starvation of the beaches. . . . Assuming that all other conditions remained the same, if the two groins were removed the supply of sand which is now impounded to the west of those groins would then be dispersed eastward and would pass across the beaches east of those groins and would improve those beaches for the short time that it took for the sand to pass across. Thereafter the beaches would return to their present condition. The improvement would be just a matter of a few days. If the littoral drift west of the groins were restored to that which existed prior to the construction of the breakwater and the groins were left in, the beaches easterly of the groins would be restored to their former condition."

Monough P. O'Brien, as a witness for defendant, testified that he is a professor of mechanical engineering at the University of California, with years of experience in the study of beach erosion; that in his opinion the cause of the erosion is the fact that the breakwater has intercepted the normal littoral drift in the region east of the breakwater. If the littoral drift were reestablished to the west of the groins and they were left in, this littoral drift would reach Eucalyptus Lane, the beaches would build back to average conditions which existed previously to the construction of the breakwater. If the groins were removed, and the breakwater were left in, the sand now impounded by the groins would move easterly and pass the beaches along Miramar Bay, continue eastward and the beaches on Miramar Bay would not show an increase in the amount of sand. On the assumption of facts stated they include erosion on the Miramar beach with no erosion to the west immediately following the increase in the height of the groins by three or four feet. If the evidence showed that there was a continuation in the erosion, one cannot attribute that erosion to these groins. Assuming the capping of the groin in 1929, the erosion commencing in July of 1929, and continuing continuously since then, he could not attribute the erosion starting in 1929 to the increase of the easterly groin and the westerly groin, for the reason that it was not sufficient to make any difference in the beach.

We are impressed that the foregoing does no more than raise a substantial conflict in the evidence as to whether there existed a reasonable need for the construction of the groins in order to protect defendant's property from the ravages of the sea, and also as to whether defendant did in fact erect the groins for the purpose of protecting its property from encroachment by the sea and to prevent erosion or for the purpose of transforming into an artificial sandy beach to be utilized in connection with bathhouses, boardwalk and other improvements incidental to a beach club, what had formerly been a rocky shore in front of its property. There is in the record evidence of sufficient substantiality to warrant the court in basing thereon a reasonable inference contrary to the contentions of defendant. Where facts are proved with legal sufficiency, a finding of fact based upon reasonable inferences drawn therefrom can-

not be disturbed on appeal any more than any other finding supported by sufficient legal evidence. (*Ryder* v. *Bamberger*, 172 Cal. 791, 799 [158 Pac. 753].) No rule of law is more familiar nor more firmly established than the one which declares that when a substantial conflict is disclosed in the evidence the findings of the trial court will not be disturbed on appeal. (*McKean* v. *Alliance Land Co.*, 200 Cal. 396 [253 Pac. 134]; *Deacon* v. *Bryans*, 88 Cal. App. 322 [263 Pac. 371].)

It is not necessary, in order to establish a theory by circumstantial evidence, that the facts be such and so related to each other that such theory is the *only* conclusion that can fairly or reasonably be drawn therefrom, because it is now settled law that ''circumstantial evidence in civil cases, in order to be sufficient to sustain the verdict, need not rise to that degree of certainty which will exclude every reasonable conclusion other than that arrived at by the jury''. (*Chalmers* v. *Hawkins*, 78 Cal. App. 733, 739 [248 Pac. 727]; opinion of Supreme Court denying a hearing in *Estate of Wallace*, 64 Cal. App. 107. 116 [220 Pac. 682]; *Tietke* v. *Forrest*, 64 Cal. App. 364 [221 Pac. 681]; *Mah See* v. *North American Acc. Co.*, 190 Cal. 421 [213 Pac. 42, 26 A. L. R. 123]; *Ley* v. *Bishopp*, 88 Cal. App. 313 [263 Pac. 369]; *Barham* v. *Widing*, 210 Cal. 206, 214, 215 [291 Pac. 173].) In the last-cited case, where the judgment was based upon an inference drawn from circumstantial evidence, although the inference was opposed to the direct testimony of the defendant and another witness, the Supreme Court upheld the judgment, declaring at page 215 of 210 Cal.: ''The jurors were entitled to accept the solution to which these circumstances led them in preference, even, to the positive testimony of the defendant and his nurse to the contrary.'' In *Mah See* v. *North American Acc. Co.*, *supra*, the court declared the rule to be that ''even though all the facts are admitted or uncontradicted, nevertheless, if it appears that either one of two inferences may fairly and reasonably be deduced from those facts, there still remains in the case a question of fact to be determined by the jury . . . the verdict of the jury . . . cannot be set aside by this court on the ground that it is not sustained by the evidence''.

It is next contended by appellant that the evidence fails to show any recoverable damage to have been caused

by the groins. Appellant's contention in this regard is to the effect that the evidence clearly and overwhelmingly shows that the breakwater constitutes one of the causes of the erosion of the easterly beaches, including the beach at Miramar. This, however, is answered by what we have heretofore said concerning the conflict in the evidence upon that issue. ▇ Nevertheless, appellant urges that even though it be conceded that the evidence does support respondents' contention that the groins erected by appellant contributed to the erosion of respondents' lands, this might under certain circumstances entitle respondents to an injunction, but would not support the finding in their favor for damages. Appellant bases this claim upon the contention that the record is barren of evidence upon which appellant's proportionate liability might fairly be determined. It must be conceded that the evidence, taken as a whole, clearly indicates that the Santa Barbara breakwater contributed in part to the damages sustained by respondents. It is equally true that appellant is liable for such proportion of the total damage resulting from the contributing factors as was caused by the groins it erected. (*Miller* v. *Highland Ditch Co.*, 87 Cal. 430 [25 Pac. 550, 22 Am. St. Rep. 254].) But in determining the amount of the damages that should be assessed against appellant herein, the trial court was entitled to estimate as best it could from the evidence before it how much of the total damage occasioned by the city's breakwater and appellant's groins was caused by the latter. (*Learned* v. *Castle*, 78 Cal. 454 [18 Pac. 872, 21 Pac. 11].) ▇ Undoubtedly in cases like this entire accuracy is impossible, and great difficulty is encountered in accurately apportioning or assessing the damage done by appellant's construction; but it must not be forgotten that such difficulty would have been avoided had appellant but taken care that no occasion should arise requiring such apportioning and assessing of the whole damages. (*Ogden* v. *Lucas*, 48 Ill. 492; *Carroll* v. *Central Counties Gas Co.*, 74 Cal. App. 303 [240 Pac. 53].) In the case at bar there is positive evidence, as hereinbefore pointed out, that the groins erected by appellant caused 75 per cent of respondents' damage, and there is some evidence to the effect that the groins were sufficient to cause all the damage. In allowing damages approximately 25 per cent of the amount testified to as having been sustained

by respondents, we cannot say that the court erred, because as is said in 26 Ruling Case Law, 764, ''The weight of authority is to the effect that where separate and independent acts of negligence of two parties are the direct causes of a single injury to a third person, and it is impossible to determine in what proportion each contributed to the injury, either is responsible for the whole injury; and this although his act alone might not have caused the entire injury, and although, without fault on his part, the same damage would have resulted from the act of the other.''

■ Appellant's next claim, that the action for damages is barred by the provisions of subdivision 2 of section 338 of the Code of Civil Procedure, is answered by the holding of the appellate court on the prior appeal in this case. (*Katenkamp* v. *Union Realty Co.*, 11 Cal. App. (2d) 63 [53 Pac. (2d) 387], hearing denied by Supreme Court) that the injury complained of herein was a ''taking and damaging of real property, as distinguished from a mere trespass on an interest in land''. An action for damages therefor is not barred until the passing of five years thereafter; that being the time necessary to elapse before title may be claimed by adverse possession. With the coming down of the *remittitur* in the appeal last referred to, the holding therein contained as to the inapplicability of the statute of limitations became the law of the case.

■ In support of its next ground of appeal, appellant, while admitting a conflict in the evidence upon the issue, nevertheless asserts that the mandatory injunction requiring the removal of the groins affords to respondents inequitable relief. The basis for this argument is the claimed fact that all of the beaches east of the Santa Barbara breakwater were denuded of sands and had similarly suffered erosion, for which reason it is argued that the expert opinions given by two witnesses to the effect that if appellant's groins were removed improvement would result in the condition of the beach on respondents' property is incredible, in face of the opinions expressed by other experts to the effect that these beaches would receive no benefit except a very slight improvement for a period of a few days following the removal of the groins. We are asked to conclude from all the evidence on this subject that the benefits which the respondents might expect from the removal of the groins would be extremely slight and merely temporary, and

would be far offset by the damage which would result to appellant's property. (*Hulbert* v. *California etc. Cement Co.*, 161 Cal. 239 [118 Pac. 928, 38 L. R. A. (N. S.) 436].) In view of the conceded conflict in the evidence upon this point, coupled with the fact that all of the matters argued by appellant as grounds for its contention were brought to the attention of the trial court, it must be assumed that the court gave them due consideration in arriving at its conclusion that the situation here presented is not one for the application of the doctrine of balancing hardships; and we are not authorized to disturb the finding of the trial court in that connection, based as it is upon a substantial conflict in the testimony with reference thereto.

█ Finally, appellant contends that the findings of fact and conclusions of law are conflicting, contradictory, not supported by the evidence, and fail to support the judgments. It would unduly prolong this already lengthy opinion to here narrate in detail the claims made by appellant in this regard. Suffice it to say that we have given careful consideration to the findings, conclusions of law and the judgments predicated thereon, as well as the evidence and exhibits in the case, from all of which we are unable to conclude that appellant's rights have been in any manner prejudicially affected thereby. The findings in the main follow the theory adopted by the trial court that appellant purchased its property here involved in its natural and normal condition of an ocean front property with a rocky beach in front of it, while respondents' properties fronted upon a sandy beach; that in erecting the groins appellant was actuated not by fear of the ravages of the sea or the desire to protect its property from the water's encroachment, but erected the groins for the purpose of improving its property at the expense of respondents' rights to the full enjoyment of their respective properties.

█ The appellant, pursuant to the provisions of section 4¾ of article VI of the Constitution and legislative enactment in accordance therewith, has filed an application to submit additional evidence. The scope, purpose and intent of the cited constitutional provision and legislative enactment were discussed at length and painstakingly analyzed in *Tupman* v. *Haberkern*, 208 Cal. 256 [280 Pac. 970], where it was said:

"We are convinced that it was not the intention of the new law that the reviewing courts should develop generally into trial courts; that it was contemplated that the courts of appellate juridisdiction would exercise the new power sparingly and, as a general rule, would exercise it only where the purpose of the new findings was to constitute a basis for an affirmance of the judgment or a basis for a reversal of the judgment with directions to the trial court to enter a judgment for the appellant."

We have given careful attention to the proposed evidence, and from a consideration thereof in connection with the entire record, we conclude that if admitted such evidence would not compel a reversal of the judgment with directions to the trial court. It is true that such evidence would indicate that since the making and entry of the judgments in these cases the Santa Barbara harbor was dredged and the shoal formed within the harbor by the trapping and deposit of sand by the breakwater was removed; that this deposit, in the process of such removal, was transferred by means of pipes and pumps to the beaches east of the breakwater along a shore front of approximately one mile, and at a distance from the breakwater which would permit wave action to resume its function of moving sand easterly along the beaches, and thus reestablish the littoral drift; that the quantity of sand thus removed from the area of the breakwater and placed upon the easterly beaches was in excess of 500,000 cubic yards. That part of the proposed evidence consisting of photographs might tend to show the restoration of sandy beaches and the arrest of erosion, and it is contended by appellant that such evidence would demonstrate that the groins built and maintained along the beaches do not deflect the sand seaward and do not deprive the leeward beaches of sands, and were not the cause of the erosion and damage of which respondents complain; but when considered in the light of all the other evidence contained in the record, including the physical fact that the erosion and damage to respondents' property commenced practically contemporaneously with the erection and maintenance of the second groin and the capping of the first groin, as well as the testimony of engineers, based upon experience with groins along the Pacific coast, that the sand immediately to the east side is affected by the groins, it is

at once apparent that the evidence submitted by appellant in its application is not decisive of the issue, by reason of which fact this court could not, following reception of the proffered evidence, direct the court below to enter a judg-- ment upon a reversal of the existent one.

For the foregoing reasons, the application for an order directing that further evidence be taken is denied, and the judgments from which the respective appeals herein were taken are, and each of them is affirmed.

York, P. J., concurred.

DORAN, J., Dissenting.—I dissent. The prevailing opinion is based upon the familiar rule that an appellate court, when called upon to determine whether there is evidence to support the judgment, will disregard the fact, if it is a fact, that the evidence is conflicting. That substantial evidence is sufficient to support a judgment even though other evidence, equally substantial or less substantial, is in conflict therewith, there can be no question. The conflict, however, in order to justify the application of the rule, must be real and not merely apparent.

In my judgment, appellant's contention is sound. The evidence of the physical facts, which are beyond dispute, together with the inferences that, by reason of the laws of nature, are inescapable, demonstrate to my satisfaction that the alleged damage is the result of the construction of the breakwater and not the groins. The logical and inevitable inference to be drawn from such evidence is secure as against any attempt to create an apparent conflict by means of opinions that at most are but speculative or wistful. An appellate tribunal is not bound to affirm a judgment that thus offends the rules of reason. The judgment of the trial court appears to me to result from the failure to distinguish between an inference and an opinion. The former has the qualities of certainty and definiteness, whereas the latter not only lacks such qualities, but may be and frequently is the product of speculation mingled with desire or even expediency.

A petition by appellant to have the cause heard in the Supreme Court, after judgment in the District Court of Appeal, was denied by the Supreme Court on March 18, 1940.