[S. F. No. 19184. In Bank. June 8, 1956.]

HIGHLAND REALTY COMPANY (a Corporation), Appellant, v. CITY OF SAN RAFAEL, Respondent.

HIGHLAND REALTY COMPANY (a Corporation), Appellant, v. CITY OF SAN ANSELMO, Respondent.

Thacher, Jones, Casey & Ball, Freitas, Allen, McCarthy & Bettini and S. J. Hugh Allen for Appellant.

Harold Jos. Haley, City Attorney (San Rafael), and John G. Buresh, City Attorney (San Anselmo), for Respondents.

SCHAUER, J.—In these two consolidated actions plaintiff appeals from a judgment quieting title in defendants, city of San Rafael and city (sometimes in the record called town) of San Anselmo, for a strip of land claimed by plaintiff which is within the respective corporate limits of one or the other of the defendants and decreeing that plaintiff has no right, title, interest, claim or estate whatsoever in any part of such land. We have concluded that plaintiff's construction of a deed executed by a common predecessor in interest of the parties to this litigation is correct, that essential findings and conclusions of the trial court cannot be sustained, and that the judgment should be reversed.

The actions were instituted in May, 1951, by plaintiff's complaints to quiet title to the strip of land, formerly used as a railroad right of way. Each city answered with a general denial, and also pleaded 10 affirmative defenses, including claims of ownership in fee simple and by adverse possession under color of title, and of dedication of the land as a public highway. The trial court found that plaintiff had no ownership of any nature in the land, that defendants

claimed an interest therein "but that such claim was not adverse to said Plaintiff it being found true that Plaintiff at the time of the commencement of these actions had no estate, right, title to, or interest in said real property," and that "each Defendant is the owner in fee simple absolute of so much of the real property . . . as lies within the limits and confines of such Defendant City or Town." As conclusions of law the court declared that each defendant "is the owner in fee simple absolute and entitled to the possession" of such of the land as lies within its limits, that plaintiff has no right or interest therein, and that each defendant was entitled to have title quieted against plaintiff. A decree quieting title was entered accordingly, and this appeal by plaintiff followed.

In 1873, and for some years prior thereto, Patrick Hayes was the owner of a tract of land known as the Hayes Ranch and situated in San Rafael Township, Marin County, which township later became, in respective parts, the incorporated city of San Rafael and the incorporated city of San Anselmo. The Hayes Ranch contained some 150 acres, including the strip of land here involved. At that time the North Pacific Coast Railroad Company, hereinafter called the railroad, was a railroad corporation organized under the laws of the State of California (Stats. 1861, pp. 607-627). In January or February, 1873, the railroad commenced an action in eminent domain against Hayes and others seeking to condemn certain of their property. The strip involved in the present case was brought into the condemnation action by an amended complaint (hereinafter called the complaint), filed June 23, 1873, which alleges "V. That the taking of the lands hereinafter described is necessary to the construction, maintenance, and operation of said Railroad. That said lands are needed for tracks, side-tracks, depot grounds, and the permanent use of said corporation. VI. That the following are descriptions of each piece of land sought to be taken and condemned to the use aforesaid of plaintiff by this action. That all and each of the said pieces of land so sought to be taken are severally located in the County of Marin, in the State of California: . . .

"2d A right of way for the construction and use of said Railroad upon, over, and along a strip of land . . . described as follows: [Here appears a metes and bounds description of the strip of Hayes' land presently involved]."

The following sketch will assist understanding of the issues hereinafter discussed:

An order authorizing the railroad to take possession, issued by the court on July 11, 1873, also describes the property as "A right of way for the construction and use of said Railroad upon over and along a strip of land . . . described as follows."

Hayes filed an answer to the complaint, but thereafter and prior to trial of the action, he conveyed the property to the railroad, by deed dated February 8, 1875, which states that he "doth grant, bargain and sell, convey and confirm unto the [railroad] . . . and to its successors, heirs and assigns forever," the property involved. Such property is described, in the language of the railroad's eminent domain complaint and of the order to take possession, as "all that right of way for the construction and use of said railroad upon, over and along a strip of land . . . described as follows: [Metes and bounds]." The deed recites a consideration of $4,500, and that "this conveyance is subject to mortgage on said land executed contemporaneous herewith by the [railroad to Hayes] . . . for $2000 of the purchase money which mortgage shall be and constitute a lien on said premises prior to all others." The deed further provided that Hayes would have the right to open streets, avenues or crossings "across the right of way and connecting his land with the County Road," (the old San Rafael-Olema road, Fourth Street in San Rafael and Redhill Avenue in San Anselmo). In the

next paragraph the deed continues: "Together with all and singular the tenements, hereditaments and appurtenances thereunto belonging or in any wise appertaining and the reversion and reversions, remainder and remainders, rents, issues and profits thereof. To Have and To Hold all and singular the above mentioned and described premises together with the appurtenances unto the [railroad] . . . , its successors heirs and assigns forever." Finally, the deed declares that "The center line above described [in the metes and bounds description] is a line run along the center of the Railroad Track as at present located and constructed on the land." It thus appears that prior to execution of the deed the railroad had entered Hayes' land pursuant to the order to take possession and had constructed its tracks, as no mention is made of a railroad track in the metes and bounds description which the railroad set forth in its eminent domain complaint.

The $2,000 mortgage mentioned in the deed was executed by the railroad on the same day, and both deed and mortgage were thereafter recorded. The railroad dismissed the eminent domain action so far as Hayes was concerned, and in October, 1875, the mortgage was released of record as having been fully paid.

In March, 1902, the railroad (North Pacific Coast Railroad Company) sold "its entire railroad system," including its interest in the Hayes property here involved, to the North Shore Railroad Company. In January, 1907, the North Shore consolidated with other companies to form the Northwestern Pacific Railroad Company.

Meanwhile, following the death of Patrick Hayes the Hayes Ranch was distributed to his widow, Mary Hayes; and on January 5, 1893, Mary Hayes conveyed the ranch by grant deed to Martin B. Magnesen "subject to *the right of way* of the North Pacific Coast Rail Road Company, conveyed by deed from Patrick Hayes to said Company, dated February 8th, 1875." (Italics added.)

Magnesen began subdividing the ranch, and recorded two subdivision maps of San Rafael Heights. He reserved on these maps an area 15 feet in width abutting for its entire length the southerly side of the strip of land here involved. The remainder of the subdivision was divided into numbered lots.

In January, 1913, Magnesen sold and granted to the Northwestern Pacific Railroad Company, "A *tract of land* ten (10)

feet in width adjoining and lying south of that portion of the *right of way* of the Northwestern Pacific Railroad Company, which was conveyed by Patrick Hayes to the North Pacific Coast Railroad Company by deed dated February 8, 1875.'' (Italics added.) This ''tract of land'' so conveyed thus constituted the northerly 10 feet of the 15-foot strip reserved on the subdivision maps. In March, 1921, Magnesen conveyed by grant deed what remained of the Hayes Ranch, to Bacigalupi. In the deed from Mary Hayes to Magnesen the northern boundary of the ranch had been described as the Olema Road, while in the deed from Magnesen to Bacigalupi that boundary was described as ''the Olema Road (sometimes called Fourth Street) and the right of way of the Northwestern Pacific Railroad Company.''

In February, 1923, Bacigalupi conveyed by grant deed to Davis, and in August, 1925, Davis conveyed (with certain lots excepted) to Highland Realty Company, the plaintiff in the present litigation. So far as here material the description in the deed from Bacigalupi to Davis and in that from Davis to plaintiff is the same as that in the deed from Magnesen to Bacigalupi; that is, the northerly boundary is stated to be the Olema Road, sometimes called Fourth Street, and the railroad right of way.

On March 1, 1941, the Northwestern Pacific Railroad Company discontinued suburban service, and on November 9, 1942, was issued a permit authorizing abandonment of the portion of the line which included the right of way here involved. The dismantling of the railroad line on this portion of its right of way was completed on March 31, 1943.

On February 1, 1945, the Northwestern Pacific Railroad Company executed two quitclaim deeds, one to the city of San Rafael and one to the city of San Anselmo (defendants herein), quitclaiming to the respective cities that portion of its former right of way here involved which lay within the corporate limits of the city. By these deeds the railroad also quitclaimed to the respective cities the portion of the 10-foot strip of land south of and adjoining the right of way, which lay within the appropriate city's corporate limits. Fifteen other parcels of land were included in the railroad's deed to San Rafael, and the city paid a total purchase price of $2,650, which it appropriated by means of a ''charter ordinance.'' The deed from the railroad to San Anselmo recited a consideration of $10.

In 1943 the public began using the strip of land here in-

volved for parking purposes and as a roadway. The use by the public increased continuously, and beginning in the spring of 1946 defendant cities reconstructed the surface of the strip, improving it to better accommodate traffic. From that time on until the summer of 1948 the cities maintained and improved the strip, by then called the "Miracle Mile." In 1948 the cities put on an armor coat pavement and publicly opened "The Miracle Mile" as a one-way street. Thereafter they continued to maintain and improve the street and traffic thereon constantly increased. Mr. Orendorff testified that he had been plaintiff's agent since 1944, with offices in San Anselmo a short distance from the roadway, and that on two occasions after 1946 he protested to the city manager of San Rafael concerning "what privilege they had of going ahead and doing any work, and they were trespassing on this right of way."

The briefs of the parties herein comprise some 370 pages and are replete with contentions, arguments, charges and countercharges. For purposes of this opinion, however, the following appear to be the points which are pertinent to resolution of the present appeal:

The first question is whether by the 1875 deed Patrick Hayes conveyed to the railroad only an easement over the strip of land presently involved, or whether the railroad received title to the underlying land itself. For several reasons it appears that only an easement passed.

■ By the condemnation action the railroad had previously filed against Hayes it could have taken only an easement although by purchase it could acquire the underlying land. (Code Civ. Proc., § 1239, subd. 2; *People* v. *Ocean Shore Railroad* (1948), 32 Cal.2d 406, 415 [196 P.2d 570, 6 A.L.R. 1179]; *City of Oakland* v. *Schenck* (1925), 197 Cal. 456, 466 [241 P. 545]; see also 17 Cal.Jur.2d 758-759; *People* v. *Thompson* (1954), 43 Cal.2d 13, 20 [271 P.2d 507].)

■ As related hereinabove, the deed, which was given only after the railroad had seemingly already constructed its tracks under the court's order of possession, followed the language of the railroad's eminent domain complaint and the order of possession in describing the property as a "right of way for the construction and use of said Railroad upon, over, and along a strip of land . . . described as follows . . ." It thus appears that the deed conveyed exactly that which the railroad sought, and was authorized, to condemn; i.e., an easement, and nothing more. ■ The fact that in his

answer in the condemnation proceeding Hayes alleged that the value of the *land* (not merely of an easement) was $4,000 and that severance damages would be $12,000 does not in its context indicate that by the deed, which recites a consideration of $4,500 and provided that Hayes could open crossings over the right of way, he conveyed the land rather than an easement only. His allegation of value referred to the "strip of land sought to be condemned described in said complaint," and must therefore be taken as referring to the right of way easement which the complaint sought to condemn, rather than to the land itself.

It is of course true, as defendants point out, that "A fee simple title is presumed to be intended to pass by a grant of real property, unless it appears from the grant that a lesser estate was intended."[1] (Civ. Code, § 1105; *Elliott* v. *McCombs* (1941), *supra*, 17 Cal.2d 23, 28.) In the Elliott case a land company deeded to Rice a parcel of land, "except the south 30 feet thereof reserved for road purposes," and in concluding that the reservation was of only an easement rather than of the land itself the court declared, quoting in part from *Parks* v. *Gates* (1921), 186 Cal. 151, 155 [199 P. 40], that "there is a vast difference between a grant for purposes of 'right of way' for a road and a grant of land 'to be used for a road.' The latter grant may be entirely consistent with the conveyance of a fee-simple title, as a road

---

[1] Although the interest in land which an easement constitutes is real property and may itself be held in fee simple (see *Appeal of North Beach & M. R. R. Co.* (1867), 32 Cal. 499, 505-510; *Ocean Shore Railroad Co.* v. *Doelger* (1954), 127 Cal.App.2d 392, 398-399 [274 P.2d 23]; *Irvin* v. *Petitfils* (1941), 44 Cal.App.2d 496, 500 [112 P.2d 688]; *Eastman* v. *Piper* (1924), 68 Cal.App. 554, 562 [229 P. 1002]; 17 Cal.Jur.2d 90-91) and may be created only by a grant, express or implied, or by prescription (see Civ. Code, § 806; 17 Cal.Jur.2d 99, and authorities there cited), nevertheless the cases, in construing the presumption declared by the provisions of section 1105 of the Civil Code, have referred to a "fee simple" title as distinguished from an *easement* (*Pellissier* v. *Corker* (1894), 103 Cal. 516 [37 P. 465]; *City of Long Beach* v. *Marshall* (1938), 11 Cal.2d 609, 615-616 [82 P.2d 362]; *Elliott* v. *McCombs* (1941), 17 Cal.2d 23, 28 [109 P.2d 329]; *People* v. *Thompson* (1954), *supra*, 43 Cal.2d 13, 20), from a *life estate* (*Burnett* v. *Piercy* (1906), 149 Cal. 178, 190 [86 P. 603]; *Barnett* v. *Barnett* (1894), 104 Cal. 298 [37 P. 1049]; *Winchester* v. *Winchester* (1917), 175 Cal. 391, 394 [165 P. 965]), and from *title* taken *in trust* (*Logan* v. *Rose* (1891), 88 Cal. 263, 267 [26 P. 106]). (See also *San Pedro etc. R. R. Co.* v. *Hamilton* (1911), 161 Cal. 610, 616-618 [119 P. 1073, 37 L.R.A.N.S. 686].) It may be further noted that "A right of way is primarily a privilege to pass over another's land. It does not exist as a natural right, but must be created by a grant or by its equivalent." (*County of Alameda* v. *Ross* (1939), 32 Cal.App.2d 135, 143 [86 P.2d 460].)

may be maintained as readily on land held in fee as under an easement, but the grant of land as a right of way recognizes nothing but an easement. This rule was applied in *Cooper* v. *Selig*, 48 Cal.App. 228 [191 P. 983], where the court construed a deed conveying land to the city of Los Angeles for the purposes of a public road as passing the fee-simple title. Under the same principle of construction, the language in the deed of the land company to Rice conveyed a fee-simple title to him with the reservation of an easement on the part of the grantor. [Citations.]'' ▮ Applying the same principle to the present case, the grant by Hayes to the railroad of a right of way "upon, over, and along a strip of land" conveyed only an easement, and not the underlying land. (See also *San Rafael Ranch Co.* v. *Ralph Rogers Co.* (1908), 154 Cal. 76 [96 P. 1092].) ▮ Further, the general rule is that "in construing contracts and deeds for railroad rights of way such deeds are usually construed as giving a mere right of way, although the terms of the deed would be otherwise apt to convey a fee. [Citations.]'' (*Coon* v. *Sonoma Magnesite Co.* (1920), 182 Cal. 597, 601 [189 P. 271]; see *People* v. *Thompson* (1954), *supra*, 43 Cal.2d 13, 21; *Ocean Shore Railroad Co.* v. *Doelger* (1954), *supra*, 127 Cal.App.2d 392, 399 [274 P.2d 23]; *Moakley* v. *Los Angeles Pac. Ry. Co.* (1934), 139 Cal.App. 421, 422-425 [34 P.2d 218]; see also *Tamalpais Land & Water Co.* v. *Northwestern Pac. R.R. Co.* (1946), 73 Cal.App.2d 917, 923-929 [167 P.2d 825]; Thompson on Real Property, (perm. ed) vol. 2, pp. 11-12, § 461, and p. 14, § 462; 132 A.L.R. 142-187.) It may also be noted that both subdivision 4 of section 801 and subdivision 5 of section 802 of the Civil Code term "The right of way" as one of the "land burdens, or servitudes upon land."

▮ Defendants argue that Magnesen's conveyance of a fee in a 10-foot strip of land adjoining the railroad right of way, as described above, indicates that he construed the Hayes' deed of 1875 to the railroad as having conveyed land rather than an easement. Magnesen was not, however, a party to the 1875 deed, and moreover, his own conveyance of the 10-foot strip was, as already mentioned herein, of "A *tract of land* ten (10) feet in width adjoining and lying south of . . . the *right of way*" (italics added) of the railroad. The language of his own deed thus indicates a distinction between the nature and extent of the property interest or right he was conveying and that conveyed by the 1875 deed.

From what has been said, it follows that title to the

land underlying the railroad right of way remained in Hayes and passed through his successors in interest to the present plaintiff. Defendant cities' suggestion that the description in the Magnesen deed to Bacigalupi, the Bacigalupi deed to Davis, and the Davis deed to plaintiff did not embrace the land presently in dispute is without merit. As already recited herein, the northern boundary of the property conveyed by such deed (in all of which deeds the total property was termed "what is generally known as the 'Hayes Ranch,' . . . Containing 150 acres, more or less") is designated as "the Olema Road (sometimes called Fourth Street) and the [railroad] right of way." Without detailing the arguments of the parties, it is apparent that the land here in question was conveyed by the deeds through which plaintiff deraigned its title.

The next question is whether by the 1945 quitclaim deeds from the Northwestern Pacific Railroad Company (successor in interest to Hayes' grantee under the 1875 deed) to the defendant cities, such cities took any interest in the railroad right of way easement.

■ Section 22 of the Act for the Incorporation of Railroad Companies (Stats. 1861, pp. 607, 618-619),[2] under which act Hayes' grantee was organized, provided that a railroad company shall not hold "real estate, or any right, title or interest, therein, acquired, or used solely, or mainly, for . . . tracks . . . [1] beyond the time of the legal existence of said company, [2] nor after the location of said track, or tracks, has been changed therefrom, [3] nor after the said company shall have failed, or ceased, to use the same, for the maintenance of such track, for the space of five years continuously; but in each of such cases, the said real estate, and all the right, title, and interest, therein, shall revert to the person, or persons, and his, or their, assigns, from whom the same was acquired by said company."

It thus appears that the statute set up three contingencies beyond which the railroad could not continue to hold property used for tracks. Defendants urge that contingency [2], change of location of the tracks, occurred in March, 1943, when the tracks were physically removed, and that this quiet title action, seeking reentry and commenced May 28, 1951, was therefore barred by the five-year statute of limitations.

[2] The act was repealed in 1951. (Pub. Util. Code, § 25002; Stats. 1951, ch. 764, pp. 2025, 2258.)

(Code Civ. Proc., § 320.) It appears, however, that contingency [3], failure or cessation of use of the property for the maintenance of the tracks for a period of five years, is more properly applicable in the present case, where the tracks were not "changed" from one location to another, but were dismantled and the portion of the line which included the right of way here involved was totally abandoned. Other sections of the 1861 act likewise indicate that a change in location of the tracks meant something other and different from abandonment. Thus in subdivision seventh of section 17 a railroad was empowered to "change the line of its road . . . ; but no such change shall vary the general route of such road . . ." And in section 20, after giving railroads certain rights of way over public lands, it is "*provided, further, that if any road, at any time after its location, shall be discontinued, or abandoned, by said company . . . or the location of any part thereof be so changed as not to cover the lands of the State thus previously occupied, then the lands so abandoned, or left, shall revert to this State. . . .*" So construing section 22, and considering the "five years continuously" of failure to use the right of way for tracks to have commenced when the dismantling was completed on March 31, 1943, it follows that this action, brought within another five years, was timely filed.[3]

 Since it is provided by section 811 of the Civil Code that "A servitude is extinguished: 1. By the vesting of the right to the servitude and the right to the servient tenement in the same person . . . ," it follows further that on reverter of the right of way easement to plaintiff upon the passage of five continuous years following failure of the railroad to use such property for its tracks, the easement was extinguished as well as any right thereto purportedly transferred by the quitclaim deeds from the Northwestern Pacific Railroad Company to the defendant cities.

---

[3]On appeal, defendants suggest that perhaps contingency [1], termination of legal existence of the railroad company, applies, asserting that the North Pacific Coast Railroad's charter expired in 1922. (See § 2 of the 1861 act.) Although plaintiff does not dispute such assertion, defendants at the trial expressly stated that they were "not relying on that [contingency] at all." Moreover, since under section 17 of the 1861 act a railroad company was given the right to convey property to the same extent as a natural person, plaintiff's position on this point appears to be sound: that the North Pacific Coast could convey its property to another railroad, but that it could not hold it beyond the expiration of its charter if it had not previously so conveyed.

Against this conclusion defendant cities argue, however, in reliance upon *Lemon* v. *Los Angeles T. Ry. Co.* (1940), 38 Cal.App.2d 659 [102 P.2d 387], that the reverter contingencies, even if otherwise applicable here, constitute penalty or forfeiture provisions, based on conditions subsequent, which are not favored by the courts; that to take advantage of such provisions plaintiff must actually exercise its claimed right of reentry; that the first act of plaintiff which could be considered an assertion of a reentry right was the bringing of this action on May 28, 1951; that inasmuch as the 1861 act was repealed effective September 22, 1951 (Pub. Util. Code, § 25002; Stats. 1951, ch. 764, pp. 2025, 2258), which was four months after this action was instituted but prior to any judgment, any rights of plaintiff dependent upon enforcement of such asserted forfeiture were thereby extinguished and will not be assisted by the courts. ▮ Regardless of whether defendants' argument would be valid if as in the Lemon case the railroad here had held title to the land, rather than only an easement over and across it, no authority has been cited or discovered holding that merger of an easement (i.e., extinguishment of the servitude) into ownership of the land itself, resulting from failure to make use of the easement for the purposes for which the servitude was created, constitutes such a penalty or forfeiture as is discussed in the Lemon case. On the contrary both the Lemon case (p. 663 of 38 Cal.App.2d) and *Hannah* v. *Southern Pac. R.R. Co.* (1920), 48 Cal.App. 517, 521 [192 P. 304], likewise relied upon by defendants, appear to recognize that the forfeiture and condition subsequent rules do not apply where only an easement was granted. (See also *Tamalpais Land & Water Co.* v. *Northwestern Pac. R.R. Co.* (1946), *supra,* 73 Cal. App.2d 917, 929, and authorities there cited.) Defendants' position on this point is consequently likewise without merit.

Defendants also suggest that they have rights of some nature based upon adverse possession. In the first place, however, as noted hereinabove, the trial court expressly found that plaintiff had no ownership of any nature in the land here involved and that defendants claimed an interest therein "but that such claim was not adverse to" plaintiff in view of plaintiff's lack of interest in the property, and that fee title to the land is in defendants. Under such circumstances it is clear that defendants' claims under their affirmative defenses of adverse possession and of dedication of the land

as a public highway were not passed upon by the trial court. Further, defendants in their brief state that they "do not claim *title* by adverse possession for we agree that adverse user for the prescriptive period may give rise to an 'implied dedication' in which event an easement is obtained." This appears to be the law. (See *Lantz* v. *City of Los Angeles* (1921), 185 Cal. 262, 268 [196 P. 481]; *People* v. *Sayig* (1951), 101 Cal.App.2d 890, 896 [226 P.2d 702]; 15 Cal. Jur.2d 262, § 5; *id.*, 344, § 56.)

Next, defendants assert that in any event, "inasmuch as the property in question was devoted to a public use, the rights of the owner of the reversion, if any, in such a case will be abridged in the public interest and the remedy of ejectment will be denied because the public use has intervened," (see *Beals* v. *City of Los Angeles* (1943), 23 Cal.2d 381, 388 [144 P.2d 839]; *Gurnsey* v. *Northern Calif. Power Co.* (1911), 160 Cal. 699, 711-712 [117 P. 906, 36 L.R.A.N.S. 185]), and plaintiff will be relegated to an action for damages. Plaintiff concedes that defendants' pleadings "show on their face that defendants have entered upon the land, and have in effect taken it by inverse condemnation, for which taking plaintiff must be paid just compensation" if the court finds that defendants' contentions of devotion to a public use should be upheld. Although plaintiff states that it seeks possession of its land by this quiet title action, and argues the evidence does not show such a public need as claimed by defendants, plaintiff nevertheless suggests that this court has the power to make a finding of intervention of public use under the provisions of section 956a of the Code of Civil Procedure. Plaintiff's own evidentiary arguments clearly show, however, that the matter should originally be determined by the trial court. (See *Peabody* v. *City of Vallejo* (1935), 2 Cal.2d 351, 378 [40 P.2d 486]; *Churchill* v. *Kellstrom* (1943), 58 Cal.App.2d 84, 90 [136 P.2d 602]; *Peckwith* v. *Lavezzola* (1942), 50 Cal.App.2d 211, 218 [122 P.2d 678].)

Defendants further urge that if plaintiff is awarded only damages, rather than possession of the land, then the matter is governed by the three-year statute of limitations applicable to an action in trespass (Code Civ. Proc.,§ 338, subd. 2), rather than by the five-year period applicable to a possessory action, and that therefore any right to damages is barred. Although where the action is brought for the recovery of damages for trespass the three-year statute has been ap-

plied (see *Williams* v. *Southern Pac. R.R. Co.* (1907), 150 Cal. 624, 628 [89 P. 599]; *Robinson* v. *Southern Calif. Ry. Co.* (1900), 129 Cal. 8, 11 [61 P. 947]; see also *Southern Pac. Co.* v. *Los Angeles Mill. Co.* (1918), 177 Cal. 395, 403 [170 P. 829]), the correct rule is that under such facts as are disclosed by the present record the defendant cities are in no position to urge the statute of limitations as a bar to the recovery of damages. It was so held in *Peabody* v. *City of Vallejo* (1935), *supra*, 2 Cal.2d 351, 380 [26], in which the acts of defendant city in appropriating certain waters riparian to plaintiffs' lands were held to entitle plaintiffs to damages even though under the doctrine of intervention of public use the city might be entitled to continue its taking of the water. (See also *Bacich* v. *Board of Control* (1943), 23 Cal. 2d 343, 346-349 [144 P.2d 818]; *Martin* v. *Western States G. & E. Co.* (1935), 8 Cal.App.2d 226, 230 [47 P.2d 522]; *Katenkamp* v. *Union Realty Co.* (1940), 36 Cal.App.2d 602, 619 [98 P.2d 239].)

Finally, the parties differ as to whether, in case plaintiff is relegated to damages rather than to possession, such damages are to be assessed by a jury. Plaintiff insists that inasmuch as this proceeding was commenced as an equitable quiet title action any issue as to damages is likewise equitable and to be tried by the court alone, whereas defendants urge a jury trial. ▮ Although no case precisely in point has been cited or discovered, the general provision of section 14 of article I of the Constitution that "which compensation shall be ascertained by a jury, unless a jury be waived, as in other civil cases in a court of record, as shall be prescribed by law," would appear to apply to compensation in an inverse condemnation proceeding with the same force as in any other eminent domain matter. (See Code Civ. Proc., § 738; 17 Cal. Jur.2d 596, § 15, and p. 598, § 18, and cases there cited.) In *Tyler* v. *Tehama County* (1895), 109 Cal. 618, 624 [42 P. 240], it was declared that an inverse condemnation action is clearly within the constitutional provision prohibiting the taking or damaging of private property for public use without the payment of just compensation therefor, and various other rules usually followed in eminent domain actions have been applied by the cases to inverse condemnation proceedings. (See *Heimann* v. *City of Los Angeles* (1947), 30 Cal.2d 746, 753 [185 P.2d 597] [costs]; *Collier* v. *Merced Irr. Dist.* (1931), 213 Cal. 554, 572 [2 P.2d 790] [costs]; 18 Cal. Jur.2d 98, §§ 377, 378, and cases there cited.) On this point,

defendants' position (that they are entitled to a jury trial) is correct. (See also *Thomson* v. *Thomson* (1936), 7 Cal.2d 671, 682-683 [62 P.2d 358, 117 A.L.R. 1], *re* trial of equitable and legal issues in the same forum.)

The judgment is reversed.

Gibson, C. J., Shenk, J., Carter, J., Traynor, J., Spence, J., and McComb, J., concurred.