[L. A. No. 12114. In Bank.—September 25, 1930.]

PERCY A. LeBRUN et al., Respondents, v. R. J. RICHARDS, Appellant.

E. R. Young and E. L. Searle for Appellant.

E. A. Lane and Victor T. Watkins for Respondents.

THE COURT.—This court granted a hearing herein after the decision of the District Court of Appeal in and for the Second Appellate District, Division Two, Burnell, Justice *pro tem.*, writing the opinion, affirming the judgment of the trial court, in order to permit a careful re-examination of the record herein. Upon such examination we are satisfied that said decision is correct as to the law and facts set forth therein, and we therefore hereby adopt the same as the decision of this court, reading as follows:

"There is no dispute as to the facts of this case, which may be summarized as follows:

"The plaintiffs, respondents here, are the owners of a parcel of land located at the south end of Vancouver avenue, on the westerly side of the street. Vancouver avenue extends in a southerly direction from Whittier boulevard, the latter running easterly and westerly. Both streets and all of the territory referred to in the evidence and findings are in Los Angeles county, outside of the boundaries of any incorporated city. Defendant-appellant owns a tract of land east of Vancouver avenue and south of the termination of that street, his property abutting that of the plaintiffs to the east and south and lying at a lower level. The general slope of the land south of Whittier boulevard, and also to the north of that thoroughfare, is from north to south. Prior to the making of certain improvements presently to be described the storm and surface waters falling upon the lands north of Whittier boulevard, to quote the language of the court's findings, 'flowed in two natural and well defined channels, which channels were of the character of depressions or swales and diverged from a common point several thousand feet northerly of Whittier boulevard, and ran, one in a southeasterly, and one in a southwesterly direction, and entered Whittier boulevard at a point several thousand feet easterly and at a point several hundred feet westerly of plaintiffs' property and drained in a southerly direction therefrom without flowing over or upon the property of the plaintiffs or of the defendant.' In May, 1922, prior to the laying out of Vancouver avenue, and also prior to the improvements referred to, the defendant constructed an irrigating ditch with each embankment and a wire fence along the northerly side of his land and within a

few feet of the south line of the plaintiffs' property. In 1924 the county of Los Angeles graded and paved Whittier boulevard, and since this improvement its elevation at a point about fifteen hundred feet westerly of Vancouver avenue is approximately one and one-fourth feet higher than at Vancouver avenue, while its elevation at a point about eighteen hundred feet easterly of Vancouver avenue is over a foot higher than at Vancouver avenue. The lowest point, however, on Whittier boulevard between these points is at Victoria, formerly known as Clela avenue, the street immediately west of Vancouver, and like the latter, running south a short distance from Whittier. At about the same time that Whittier boulevard was being improved a large area of land lying north of it and extending for several thousand feet both easterly and westerly of Vancouver avenue, and which had in former years been used for grazing and later on for agricultural purposes, was subdivided and platted and a large number of streets laid out thereon and graded and paved, the northerly ends of the north and south running streets being over thirty feet higher than the elevation of Whittier boulevard at its several points of intersection with the southerly termini of said streets. The court found 'that the grading and paving of said streets north of Whittier boulevard, resulted in the filling up and closing of said natural drainage channels north of Whittier boulevard and the storm and surface waters which formerly flowed across Whittier boulevard easterly of plaintiffs' property were diverted into Whittier boulevard at a point several hundred feet westerly of its natural channel and water that formerly crossed Whittier boulevard westerly of plaintiffs' property was diverted into Whittier boulevard at a point several hundred feet easterly of its natural channel and to a point several hundred feet easterly from where it usually flowed and crossed Whittier boulevard; that due to the graded and paved condition of said last mentioned streets, the natural flow of storm and surface water falling on those lands and the lands northerly thereof has been greatly accelerated with the result that during the rainy seasons of the year storm and surface waters flow in a southerly direction over and along said last mentioned streets to Whittier boulevard.' The result of the change in the grade of Whittier boulevard, together with the im-

provement of that thoroughfare and of the land north of it as above described has been to cause this accelerated flow of storm and surface water thus brought onto Whittier boulevard to escape therefrom at the low points and thus to flow down Vancouver and Victoria avenues, to some extent onto the land of plaintiffs, and if not diverted, across the land of the defendant.

"It is apparent from the evidence (nor is there any contention to the contrary) that the construction of the ditch, embankment and fence by the defendant did not in any way detrimental to the plaintiffs affect the flow of the surface or storm waters under the conditions which obtained at the time of their construction or until the completion of the various improvements above referred to. But in 1925, and after conditions had been changed as described in the portion of the findings from which we have quoted, there was a heavy fall of rain and the water which poured into Whittier boulevard flowed south therefrom in Vancouver avenue 'just like a river' as one witness expressed it. Defendant's ditch was utterly inadequate to the task of carrying off this torrent of water and his embankment and fence presented an obstacle to its further southerly progress and caused it to back up and to overflow plaintiffs' property, thereby causing considerable damage thereto. There was a recurrence of these conditions in 1926.

"The appellant denies liability for the damage caused to respondents' property and seeks a reversal of the judgment upon the theory that as a matter of law he was not required to receive surface waters in greater quantities or in a different manner than would occur under conditions such as existed prior to the improvements referred to and the consequent interference with the flow of such waters and the diversion and concentration thereof onto his property. Stated in different words, his contention is that he had a right to protect his property from the onslaught of waters which, under natural conditions, would not have been precipitated thereon.

"It is thoroughly settled in California that the owner of the upper or dominant estate has a legal and natural easement or servitude in the lower or servient estate to discharge all surface waters naturally falling or accumulating on his land, upon or over the land of the servient

owner in the manner in which they would naturally flow from a higher to a lower level and that the owner of the lower estate is answerable in damages for any injury which may be caused to the upper estate by reason of obstructions which he has placed in the way of such natural flow, thus causing it to back up or remain on the land of the upper proprietor (*Jaxon* v. *Clapp*, 45 Cal. App. 214 [187 Pac. 69, 70]; *Board of Trustees* v. *Rodley*, 38 Cal. App. 563 [177 Pac. 175, 176]; *Ogburn* v. *Conner*, 46 Cal. 347 [13 Am. Rep. 213].) In *Heier* v. *Krull*, 160 Cal. 441 [117 Pac. 530, 531], which is regarded as a leading case on the subject of surface waters, the rule is stated as follows: 'Every landowner must bear the burden of receiving upon his land the surface water naturally falling upon land above it and naturally flowing to it, therefrom, and he has the corresponding right to have the surface water naturally falling upon his land or naturally coming upon it flow freely therefrom upon the lower land adjoining, as it would flow under natural conditions. From these rights and burdens, the principle follows that he has a lawful right to complain of others, who, by interfering with natural conditions, cause such surface water to be discharged in greater quantity or in a different manner upon his land than would occur under natural conditions. This is the settled law of this state.' In support of the above statement the court cites a long array of earlier decisions. ■ On the other hand, a different rule applies in the case of flood waters. Such waters are regarded as 'a common enemy against which every man has a right to defend himself, regardless of the fact that the barriers he erects for the protection of his land may cause the flood to rise higher or flow with greater force upon his neighbors.' (*McDaniel* v. *Cummings*, 83 Cal. 515 [8 L. R. A. 575, 23 Pac. 795, 797].) This rule has been enunciated and applied in a number of cases, among which may be mentioned *Lamb* v. *Reclamation Dist.*, 73 Cal. 125 [2 Am. St. Rep. 775, 14 Pac. 625], *Sanguinetti* v. *Pock*, 136 Cal. 466 [89 Am. St. Rep. 169, 69 Pac. 98, 99], *Gray* v. *Reclamation Dist.*, 174 Cal. 622 [163 Pac. 1024], and *Horton* v. *Goodenough*, 184 Cal. 455 [194 Pac. 34, 35]. A concise statement of the rules relating to the right to protect one's property from damage by water is found in the case last cited: 'First, one has no right to obstruct the flow

onto his land of what are technically known as surface waters. (*Heier* v. *Krull*, 160 Cal. 441, and authorities therein cited, at page 444 [117 Pac. 530, 531].) But by surface waters are not meant any waters which may be on or moving across the surface of the land without being collected into a natural watercourse. They are confined to waters falling on the land by precipitation or rising thereon in springs. Putting it conversely, they do not include waters flowing out of a natural watercourse, but which yet were once a part of a stream and have escaped from it—flood waters, in other words. . . . Second, one has the right to protect himself against flood waters, that is, waters of the character last described, and for that purpose to obstruct their flow onto his land, and this even though such obstruction causes the water to flow onto the land of another. . . . Third, one may not obstruct or divert the flow of a natural watercourse. But by watercourse is not meant the gathering of errant water while passing through a low depression, swale, or gully, but a stream in the real sense, with a definite channel with bed and banks, within which it flows at those times when the streams of the region habitually flow.'

"In view of the different rules applicable in the respective cases of flood and surface waters it is important that the nature of the waters involved in the present case be ascertained. ▮ Flood waters are those which escape from a stream or other body of water and overflow the adjacent territory (*McDaniel* v. *Cummings, supra; Gray* v. *Reclamation Dist., supra; Horton* v. *Goodenough, supra*). ▮ Surface waters are those which are produced by rainfall, melting snow, or spring and which in the case of the two first-mentioned sources are precipitated, and in the case of the last-mentioned source, rise upon the land. (See cases cited *supra*.) Such waters are not divested of their character as surface waters by reason of their flowing from the land on which they first make their appearance onto lower land in obedience to the law of gravity. It is waters of this character that the lower or servient estate is bound to receive from the upper or dominant estate and the flow of which he may not obstruct to the detriment of the upper proprietor provided their flow is a natural one. ▮ The upper proprietor may not divert by artificial means

the surface waters upon his own lands to the lands of the lower proprietor nor may he accelerate by means of ditches or increase the drainage of his own land to the injury of the lower owner. His right 'is limited to the disposition of the water through the chosen channels of nature.' (*Board of Trustees* v. *Rodley, supra.*)

■ "Tested by these definitions it is evident that the water which came into Vancouver avenue from Whittier boulevard and hence onto the land of the plaintiffs and the escape of which over the lands of defendant was prevented by the obstructions maintained by him was surface water, caused by the rainfall on the land north of Whittier boulevard.

"It is significant that all of the decisions which state and apply the rule as to the duty of the lower proprietor to receive the surface waters flowing from the land of the upper proprietor relates to the *natural* flow thereof. Thus *Heier* v. *Krull, supra,* states the rule as follows: 'Every landowner . . . has a lawful right to complain of others who, by interfering with *natural* conditions, caused such surface water to be discharged in greater quantity or in a different manner upon his land than would occur under natural conditions,' while in *Jaxon* v. *Clapp, supra,* it is enunciated: 'The general rule is that where two adjacent parcels of land belong to different owners, one being lower than the other, and the surface water from the higher tract has been accustomed by a *natural* flow to pass over the lower tract, the owner of the higher land has an easement by virtue of which storm waters from such land may be permitted to flow on the lower tract, which latter is charged with a corresponding servitude,' and in *Sanguinnetti* v. *Pock, supra,* the court said: 'It is settled law in this state that plaintiff as the owner of the upper land has an easement over the lower adjacent land of defendant to discharge surface water *as it is accustomed naturally to flow,* and defendant had no right to intercept such *natural* flow to plaintiff's injury.' (Italics ours.) See, also, *Board of Trustees* v. *Rodley, supra,* and *Rudel* v. *Los Angeles County,* 118 Cal. 281 [50 Pac. 400]. The court below found, as stated in the *résumé* of the facts at the beginning of this opinion, that the natural flow of the surface waters from the land north of Whittier boulevard, prior to the work done by the

county on that street and to the subdivision and improvement of that territory was not onto or over the land of either of the parties to this action, but was across Whittier boulevard at points 'several thousand feet easterly and . . . several hundred feet westerly of plaintiffs' property.' It is contended by appellant that it was not the *natural* flow of the waters which he obstructed, but rather an *unnatural* flow caused by the interposition of forces set in motion by those whose grading, leveling, paving and other works of improvement operated to divert the former course of the waters and caused them to find a new channel which carried them down Vancouver avenue and onto the land of the plaintiffs and which, except for the obstructions, would have caused them to flow therefrom over the lands of the defendant. He argues that because of this fact the 'common enemy' rule applicable to flood waters should be applied rather than the surface water rule. ■ The fallacy of this argument is based upon a misconception of the meaning of the word 'natural' as applied to the course taken by the run-off of surface water. It does not mean 'original,' it has no necessary relation to the contour of the terrain or to the course taken by the flow prior to any alteration of either by the works of man or by changes due to the operation of the forces of nature. As the word is used in the discussion of questions relating to the reciprocal rights and duties of upper and lower proprietors with respect to surface waters it has reference to that course which would be taken by such water falling (or in the case of springs, rising) on the land of the upper proprietor, or carried thereto from still higher land, and flowing or running therefrom onto the lands of the lower proprietor undiverted and unaccelerated by any interference therewith by the upper proprietor. As said in *Larrabee* v. *Cloverdale*, 131 Cal. 96 [63 Pac. 143, 145] : 'We may, therefore, construe the term ''natural channel'' as including all channels through which, in the existing condition of the country, the water naturally flows,' and again, 'For by the necessarily great changes that must occur in the conformation of the country in the building of a city natural channels for the surface water are changed and, as the changes in the ground are inevitable and legitimate, and therefore natural, the new channels, through which under natural laws the

surface waters are discharged, must also be regarded as natural.' ■ If, then, surface waters which had formerly been carried off in a direction which took them to the right and to the left of plaintiffs' land without entering thereon were, by reason of the diversion thereof consequent upon the changed conformation of the country brought about by the making of the improvements hereinbefore described, cast · upon plaintiffs' property, it was still the duty of the lower proprietor to receive such waters naturally flowing ·from plaintiffs' land onto his, provided, of course, that their flow was neither accelerated, diverted or concentrated by any act of the plaintiffs. The rule as above stated is well illustrated in the case of *Thompson* v. *La Fetra*, 180 Cal. 771 [183 Pac. 152, 153], in which it was held that the 'common enemy' rule applicable to flood waters cannot be invoked in favor of landowners who, to prevent injury to their lands from seasonal waters flowing from a cañon, erected an obstruction which turned the water onto the land of their neighbors 'since the water not being in any sense flood water, the changing of its course and casting it upon other lands amounted to a trespass.' The court there said: 'The rule applicable to waters which are a "common enemy" cannot be invoked under the facts of this case. That rule has ·application only to flood waters in the strict sense, that is to say, to waters escaping because of their height from the confinement of a stream and running over the adjacent country. The waters here involved are ˙not of that sort. The water not being in any sense flood water, the defendants, by changing its course and casting it upon the lands of the plaintiff, were guilty of a trespass. The fact that the water may have threatened injury to the defendants affords no justification or excuse to palliate the wrong done. If the injury threatened to the defendants' lands was the result of wrongful artificial changes made by upper proprietors, resulting in an increased, accelerated, or concentrated, flow of water upon and across the lands of the defendants, their remedy was to proceed by appropriate action against the wrongdoers to enjoin such changes or to have the nuisance abated, and not by an attempt to shift the burden of the wrong upon an innocent third party who, but for their intervening willful act, would have suffered no injury at all.'

"That the defendant might have had relief as against those who caused the original diversion of the water is well established by such cases as *Conniff* v. *San Francisco,* 67 Cal. 45 [7 Pac. 41], *Los Angeles Cemetery Assn.* v. *Los Angeles,* 103 Cal. 461 [37 Pac. 375], and *Larrabee* v. *Cloverdale, supra.* If, instead of pursuing the remedies available to him as against those whose acts were the proximate cause of the danger to his property, he chose to protect it at the expense of his neighbor, he must answer for the injury he has thus done to the latter.

"Appellant's second point is that the judgment in the sum of one thousand dollars which was awarded plaintiffs in the court below 'is excessive, and contrary to the evidence and not supported by admissible testimony.' As to the amount of damages suffered by the plaintiffs the case was apparently tried by both parties upon the theory that the proper measure of damages was the cost of repair, whereas the correct rule is that the measure of damages for injuries to real property is the difference, if any, in its market value before and immediately after the injury (*Perkins* v. *Blaugh,* 163 Cal. 782 [127 Pac. 50]). No point is made as to the admission of evidence of repair cost as such, the sole contention being that the testimony of Mr. LeBrun, one of the plaintiffs, should not have been considered by the court in arriving at the amount of the damage because cross-examination revealed the fact that he was not an expert contractor and that his figures were based largely upon estimates furnished him by others. His testimony was that the cost of repairing the house would be $800; that he had replanted shrubbery washed out or destroyed by the water at a cost of $25; and replaced gravel washed from the driveway at a cost of $20; that the work done by himself in replacing the lawn washed away amounted to $64, making a total sum of $909. As to the $800 item we are of opinion that appellant's point is well taken. An owner of property may, without being qualified as an expert on values, testify as to his opinion of the value of that which he owns (*Hood* v. *Bekins Van & Storage Co.,* 178 Cal. 150 [172 Pac. 594]; *Willard* v. *Valley Gas & Fuel Co.,* 171 Cal. 9 [151 Pac. 286]). This rule, however, does not extend to the giving of testimony as to the cost of repairs, especially where such testimony is merely a repetition of

the statements of other persons to the witness. But if the testimony of LeBrun as to the cost of repairs to the house be eliminated from consideration there is still left his undisputed testimony as to the other items, totaling $109, and there is also the testimony of witness Mongey, a carpenter, contractor and builder of many years' experience, who testified that he had made an examination of the building for the purpose of making an estimate of the cost of repair and that it would be $750. The total amount testified to by LeBrun, exclusive of repairs to the house, added to the figure given by Mongey as the cost of such repairs, makes a grand total of $859, or $141 less than the amount awarded. Appellant further urges that even if the cost of repair as testified to by Mongey and LeBrun be deemed established, there is still a lack of evidence to support the finding of $1,000 damages. But beside the items of damage above mentioned there was evidence that during 1925 the plaintiffs were compelled to move out of their house on several different occasions, and to remain away from it for periods aggregating about a month in all and that the same thing occurred again in 1926. According to the undisputed testimony of LeBrun, the rental value of the house was $35 or $40 per month. This deprivation of use would add at least $70 to the financial damage proven. Taking into consideration the actual discomfort and annoyance suffered by the plaintiffs it would seem that the $71 allowed by the trial court in addition to the actual money loss proven was, to say the least, far from excessive. ▉ As to this element of damages the amount of compensation in dollars and cents is of course not susceptible of proof, it must be left to the sound discretion of the trial court, to be ascertained and adjudged after consideration of all the facts and circumstances established by the evidence in the case. As was said in *Douberman* v. *Grant*, 198 Cal. 586 [48 A. L. R. 1244, 246 Pac. 319, 321] : 'It was not necessary to the recovery of damages caused by the nuisance of smoke and soot to prove actual damage to plaintiff's property. She was entitled to recover for the personal discomfort and annoyance to which she had been subjected and it was a question for the trial court to determine the amount of the compensation which she should receive.' To the same point are the decisions in *Judson* v.

*Los Angeles Suburban Gas Co.,* 157 Cal. 168 [21 Ann. Cas. 1247, 26 L. R. A. (N. S.) 183, 106 Pac. 581], and *Tuebner* v. *California Street Ry. Co.,* 66 Cal. 186 [4 Pac. 1162]."

The judgment is affirmed.