[Civ. No. 17765.   Second Dist., Div. Three.   Apr. 2, 1951.]

THE ANDREW JERGENS COMPANY (a Corporation), Appellant, v. THE CITY OF LOS ANGELES et al., Respondents; PANORAMA VILLAGE (a Corporation), Intervener.

Frank Mergenthaler, Hill, Farrer & Burrill and William S. Scully for Appellant.

Ray L. Chesebro, City Attorney, Bourke Jones and Charles F. Reiche, Assistant City Attorneys, C. W. Cornell and Randolph Karr for Respondents.

Pacht, Warne, Ross & Bernhard for Intervener.

SHINN, P. J.—This action involves the disposition of surface waters in a district in the San Fernando Valley section of the city of Los Angeles, lying northerly of the intersection of Van Nuys Boulevard and the coast line of the Southern Pacific Railroad Company. Plaintiff seeks protection against the flooding of its land by water which it alleges will be accumulated at the intersection and diverted to its land by works already established by the city and by the paving of additional sections of the boulevard as planned by the city at the time the action was commenced. It is not the purpose of the action to prevent the contemplated improvement altogether, but only until the city has made provision to carry the expected excessive quantities of water easterly to the Tujunga Wash, a natural and well developed flood control channel.

The area to be considered in the solution of the drainage problem consists of the surface of Van Nuys Boulevard for a distance of about 2½ miles north of the intersection, together with certain areas from which drainage would be toward the boulevard. Due to the slope of the boulevard any water which reaches the paved surface flows south to the intersection. Just north of the intersection water flows into catch basins, which the city has installed underneath the pavement, thence through a culvert designated "C" to and along a ditch in the northerly part of the railroad right of way for a distance of 600 feet, thence underneath the right of way through a culvert ("A") opening to the south toward plaintiff's adjoining land. Along each side of the right of way is a depression extending easterly and westerly but these have not the capacity to hold any considerable amount of water.

At the time the action was instituted the boulevard was paved for a distance of 2,000 feet northerly from the intersection and it was planned to pave it for an additional 4,000 feet. In this area the boulevard is 100 feet wide. A temporary injunction was issued, the effect of which was to cause discontinuance of the work pending a trial of the action. The judgment granted an injunction which affected only about 45 acres from which surface water would drain onto the boulevard. The city was restrained from approving the opening or improving of any streets in this area unless they are graded to drain away from the boulevard from points not more than 15 feet from the east, or the west edge of the boulevard, as the case might be. There was also a provision that would require water collected in alleys in any new subdivisions in the same eastern area to be drained away from the boulevard.

Plaintiff, deeming the relief granted to be inadequate, has appealed from the judgment. The respondents are the city and Panorama Village, a corporation which intervened in the action because of its ownership of a large real estate development east of the boulevard.

█ The legal principle governing the disposition of surface waters is simple and well established. It was stated in *Heier* v. *Krull*, 160 Cal. 441, 444 [117 P. 530], as follows: "Every landowner must bear the burden of receiving upon his land the surface water naturally falling upon land above it and naturally flowing to it therefrom, and he has the corresponding right to have the surface water naturally falling upon his land or naturally coming upon it, flow freely therefrom upon the lower land adjoining, as it would flow under natural conditions. █ From these rights and burdens, the principle follows that he has a lawful right to complain of others, who, by interfering with natural conditions, cause such surface water to be discharged in greater quantity or in a different manner upon his land, than would occur under natural conditions. This is the settled law of this state. (*Conniff* v. *San Francisco*, 67 Cal. 45, 49 [7 P. 41]; *Ogburn* v. *Connor*, 46 Cal. 346, 351 [13 Am.Rep. 213]; *McDaniel* v. *Cummings*, 83 Cal. 515, 519 [23 P. 795, 8 L.R.A. 575]; *Gray* v. *McWilliams*, 98 Cal. 157, 162 [32 P. 976, 35 Am.St.Rep. 163, 21 L.R.A. 593]; *Stanford* v. *San Francisco*, 111 Cal. 198 [43 P. 605]; *Hicks* v. *Drew*, 117 Cal. 305 [49 P. 189]; *Rudel* v. *Los Angeles County*, 118 Cal. 281, 288 [50 P. 400]; *Cushing* v. *Pires*, 124 Cal. 663, 665 [57 P. 572]; *Cloverdale* v. *Smith*, 128 Cal. 230, 233 [60 P. 851]; *Larrabee* v. *Cloverdale*, 131 Cal. 96, 99 [63 P. 143]; *Wood* v. *Moulton*, 146 Cal. 317 [80 P. 92].)" Later cases are *Los Angeles Brick & C. Products Co.* v. *City of Los Angeles*, 60 Cal.App.2d 478 [141 P.2d 46], *Dick* v. *City of Los Angeles*, 34 Cal.App. 724 [168 P. 703] and *Farrell* v. *Ontario*, 36 Cal.App. 754 [173 P. 392].

Respondents do not contend for any other principle. They cite *Womar* v. *City of Long Beach*, 45 Cal.App.2d 643 [114 P.2d 704], *Turner* v. *Hopper*, 83 Cal.App.2d 215 [188 P.2d 257], *Le Brun* v. *Richards*, 210 Cal. 308 [291 P. 825, 72 A.L.R. 336], contending that these cases have application to the facts of the instant case. But the facts in the cases they rely on are clearly distinguishable. In all of them the problem of surface water had not been created artificially for the complaining landowner, but had existed before the construction of the works in question. Such is not the present case. Even

in times of heavy rainfall surface water has not been drained to plaintiff's land from areas which will drain into the paved boulevard; plaintiff has not in the past had a surface water problem.

Respondents say first that the city has done nothing which would bring the case within the foregoing rule under which plaintiff claims protection; that the grading and paving of the boulevard and the development of a rural community to the north have not "diverted" any storm water so as to cause it to flow in an unnatural manner and, hence, that although storm water, if not controlled, will at some future time be collected in large quantities and discharged upon plaintiff's land, where none has hitherto found its way, plaintiff is bound to receive this water upon its land unless the city shall see fit to dispose of it in some other manner. In order to sustain this position it was incumbent upon respondents to show that the paving of the boulevard would not result in the discharge of excessive quantities of water upon plaintiff's land. As we shall see, all the evidence was to the contrary. The city's own engineers and all the other engineering experts who testified from the charted history of rainfall in the district agreed that storm waters will inevitably be carried to plaintiff's land in flooding quantities. The second contention of the respondents is that this will not happen in the immediate, or forseeable future, but only when the district is fully "urbanized," and they argue that the present action is prematurely brought. These contentions will be considered together.

The material facts of the case are not in dispute. There was no evidence opposed to or contradictory of that given by plaintiff's expert witnesses. This was evidence of physical facts as to the composition, slope and contour of the land adjacent to the boulevard, and the conclusions of the engineers followed from their mathematical calculations, the history of rainfall and the fact that water runs downhill. Such factual evidence may not be disregarded. From an engineering standpoint the only questions are how soon and how extensively will plaintiff's land be flooded if nothing is done to prevent it.

It is necessary to give a further description of the area in question. Immediately north of the railroad property and east of the boulevard a tract of about 100 acres fronting on the boulevard is occupied by a plant of General Motors. To the north of this area and on the east side of the boulevard the lands are either unimproved or are subdivided and im-

proved for residential and business uses. An older residential area lies on the west side. Roscoe Boulevard intersects Van Nuys Boulevard some 3,400 feet north of the railroad property; Parthenia Street east of the boulevard is 2,600 feet north of Roscoe; Osborne Street is 1,600 feet north of Parthenia. Van Nuys Boulevard is paved north from Osborne a distance of 6,000 feet to its intersection with Woodman Avenue. The intervener, Panorama Village, a corporation, has built a large number of residences between Roscoe and Osborne Avenues. There has been a small amount of improvement of the boulevard frontage in this area. Evidence was given by engineers that the land bordering the boulevard on the east, to a depth from the boulevard of some 250 feet, and for a length of about 13,000 feet between the railroad property and the intersection of Van Nuys Boulevard and Woodman slopes toward the boulevard. Beyond the 250-foot line it slopes toward the east. There is also a large area west and northwest which slopes toward the boulevard. The actual tributary area was computed by engineers at approximately 598 acres. General Motors and Panorama Village have constructed control systems of their own which will carry surface water from most of their lands toward the east and south away from the boulevard. After taking all factors into consideration the tributary area was computed by expert witnesses at approximately 500 acres. There was no evidence to the contrary. It is immaterial, however, what the exact tributary area may be, since it was clearly established by the evidence that the existing conditions present a serious drainage problem at the intersection of the boulevard and the railroad property which must be solved if plaintiff's land is to be protected against overflow by surface waters. The problem has been the subject of conferences by the city engineers of Los Angeles and engineers of plaintiff, General Motors, Kaiser Community Homes, Panorama Industrial Development Company, Panorama Ranch, Southern Pacific Company, Technicolor Company and Roy C. Seeley Company. The consensus of these well qualified and well informed men was stated in a letter of February 28, 1946, prepared by L. O. Turner, Deputy City Engineer of the Valley District, and sent under the signature of the City Engineer to Mr. Roy Seeley. The statements and conclusions to be quoted from it were well established by evidence at the trial. After mentioning that as long as the land in question was devoted to agricultural use, the rainfall had been absorbed by the soil, which

is sandy and porous, thus obviating any excessive accumulation of water at the railroad right of way, the letter stated: "With the proposed improvement of Van Nuys Blvd. however, this water will be brought directly to the Southern Pacific Coast Line crossing by the impervious street surface of Van Nuys Blvd. without the benefit of any absorption, and will produce excessive quantities of surface water to be handled at, and immediately northerly of the railroad crossing. Upon the completion of the improvement of Van Nuys Blvd. the quantities of water which may be anticipated at this point may well reach between 200 and 300 cubic feet per second. As the tributary area develops, an increase in runoff may be expected, and these quantities may soon double those now anticipated.

"Since there is no bridge or culvert opening under the Southern Pacific Coast Line tracks between the Pacoima Wash bridge, approximately one-half mile westerly of Van Nuys Blvd. and a small $2\frac{1}{2}'$ x $6'$ opening approximately 600 feet easterly of Van Nuys Blvd., it is apparent that the southwesterly corner of the General Motors Plant and the proposed Southern Pacific Yard, as well as the Pacific Motor Transport driveway along the northerly side of the Southern Pacific Yard may be seriously flooded during heavy storm periods.

"The Southern Pacific have attempted to improve this situation by excavating a ditch from the existing culvert under Van Nuys Blvd. immediately northerly of the Coast Line crossing to this structure beneath their tracks, some 600 odd feet easterly of the Van Nuys Blvd. crossing. If this ditch proves at all effective, the accumulated water northerly of the Southern Pacific tracks will be discharged in a concentrated form on to the property of the Andrew Jergens Company, located immediately southerly of the Southern Pacific tracks, and easterly of Van Nuys Blvd. producing, no doubt, a very unsatisfactory condition at this point. Should the Andrew Jergens Company attempt to convey this accumulated surface water across their property in a lined channel or storm drain, then excessive quantities of water would be delivered upon the adjoining private property southerly of the Jergens property which property has not heretofore been subject to such concentration of surface water." It was then pointed out that the only practical solution lay in the installation of a channel along the south side of the railroad right of way easterly to Tujunga Wash. It was also said: "We are satisfied that no less permanent solution will satisfactorily dispose

of the accumulated surface drainage tributary to the crossing of Van Nuys Blvd. and the Southern Pacific Coast Line tracks and that no less expensive solution can be found to minimize the detrimental effect of the drainage upon the industrial development of this area. Furthermore, until this drainage is satisfactorily disposed of, access to the General Motors plant and the use of Van Nuys Blvd. may be seriously impeded during moderate to severe storm periods.''

In his opening statement at the trial the city attorney said: ''This will be—and I wouldn't want to mislead anybody—if that area eventually is entirely developed, there is a problem that will result at the intersection of Van Nuys Boulevard and the Southern Pacific tracks, and that will have to be taken care of; but it doesn't have to be taken care of today, this year, or tomorrow, or next year; and there isn't any imminent danger of any damage to this Jergens property as of today or in the immediate future. Again I state that this case is entirely premature and we will show we are continuously working on plans. We haven't got a set plan right now for taking care of that particular condition, as we don't believe it calls for attention right at this moment. But we are in continual negotiation, and we are always taking matters up with the railroad about this and about that, and we are always trying to work out something.''

The undisputed expert testimony was that rainfall which, in the light of experience is to be anticipated, namely 1.33 inches in one hour, will deposit 75 cubic feet of water per second at culvert ''A'' leading to plaintiff's land. This quantity would accumulate irrespective of any increased quantities that might result from the future improvement of the tributary land. It is conceded that as the boulevard frontage and adjacent property is developed, thus minimizing absorption, the volume reaching the boulevard will be greater. According to the testimony full residential and business development of the area would increase the flow by 41 cubic feet per second. With the boulevard paved for 6,000 feet and without further development, one-third of the accumulation of water from a rainfall of 1.33 inches in one hour would cause flooding of plaintiff's land.

The city does not question the correctness of the computations and conclusions of its engineers as to quantities, nor the soundness of their plans for the disposal of storm waters. Intervener does not challenge the accuracy of the expert

evidence in any factual respect which would cast doubt upon the ultimate conclusion that there is grave danger of the flooding of plaintiff's land.

The court made no finding as to the acreage that is tributary to Van Nuys Boulevard, nor as to the quantity of water that will be carried to the intersection and thence to plaintiff's land in storms of the intensity of those taken into consideration in the calculations of the engineers. No finding was made as to the minimum rainfall that would cause flooding of plaintiff's land. In brief, no facts were found which would support the contentions of the respondents. We must therefore accept as a basis for our conclusions the uncontradicted calculations of the engineers, among whom were competent and well informed members of the Los Angeles city engineer's staff. They were, in our opinion, carefully considered and on the conservative side.

The court found that if any surface waters find their way to plaintiff's land, it will be ''solely by reason of the urbanization of the drainage area from which said waters naturally flow, and such waters which might reach plaintiff's land will not be increased by reason of the *drainage structure* constructed by the city of Los Angeles under Van Nuys Boulevard *from the catch basins on either side* of the roadway to culvert C.'' (Emphasis added.) It has been shown that there is no basis in the evidence for the conclusion that any flooding of plaintiff's land will be occasioned solely by ''urbanization'' of tributary areas, unless that term is so construed as to include the paved surface of the boulevard, as well as other improvements that will tend to prevent absorption. In arguing that only further ''urbanization'' will cause excessive accumulation of water the intervener says: ''Reference is here made also to the testimony that assuming no further street improvements are made, and assuming the area were fully urbanized, water might come onto the plaintiff's land. For the paving and widening of Van Nuys Boulevard are bound to be without appreciable effect. All of the paving has been done and is projected *strictly according to grade and to the natural contour of the land.* There will be no abnormal accumulation of surface water as a result of this improvement which, when completed, will total not more than 10 acres of paved surface.'' The testimony referred to assumed complete development of 1,000 acres adjacent to the boulevard. This testimony does not support the finding in either respect. It only tends to emphasize the growing

danger of a condition which is already serious. It is undeniable that 2½ miles of pavement will confine and carry to the intersection large quantities of water that otherwise would be absorbed. The trial court did not find that water would not be channeled south on the boulevard. It found merely that the catch basins and runways would not increase the quantity of water that would reach plaintiff's land. This finding ignores the real source of the danger, namely, the channeling of water to the catch basins. But even the catch basins and culverts are designed to divert water which would otherwise flood areas north of the elevated right of way, and to that extent they place an unnatural burden upon plaintiff's land.

The contention that the action is premature is not supported by the record. Although rainfall of 1.33 inches in one hour is rare in the district, it was shown by rainfall charts in evidence that far greater quantities have fallen within 24 hours at not infrequent intervals. There was undisputed evidence that saturation of the soil and some run off had occurred during these storms; that there had been sufficient absorption before the boulevard was paved to prevent accumulation of water at the intersection, and that when such storms recur after the proposed paving has been completed large quantities of water that cannot be absorbed will be channeled to the intersection.

The court found: ". . . there is no present or reasonably foreseeable danger of surface water being accumulated, concentrated or discharged upon plaintiff's land through or by means of Culvert A" etc. The finding is without factual basis in the evidence and there were no physical facts found which justify this general conclusion. As a foundation for denying plaintiff substantial relief it is no more than a prediction that heavy storms which history shows have frequently occurred will hold off until the city has provided means for the disposition of the water.

By the judgment the city and its representatives are enjoined from approving the opening and improvement of any new streets easterly from Van Nuys Boulevard between Parthenia Street on the north and Roscoe Boulevard on the south (about 35 acres) and from approving the opening and improvement of new streets through lands bounded on the north by the intersections of Vesper Avenue and Van Nuys Boulevard, on the east by Van Nuys Boulevard, on the south by Roscoe

Boulevard, and on the west by Vesper Avenue (about 15 acres), unless any new streets drain surface water away from the boulevard from points not more than 15 feet from the boulevard. These provisions and the further provision that in any further subdivision of land abutting upon the easterly side of the boulevard between Parthenia Street and Roscoe Boulevard alleys must be provided to drain water away from the boulevard are to remain in operation only until facilities are provided to drain waters accumulated at the intersection of Van Nuys Boulevard and the railroad property easterly to Tujunga Wash. By these injunctive provisions the court gave recognition to the necessity of preventing the installation of further street improvements which would tend to collect and convey water to Van Nuys Boulevard. It is impossible to reconcile the relief granted with the deduction that ''there is no present or reasonable foreseeable danger of surface water being accumulated, concentrated or discharged upon plaintiff's land through or by means of Culvert A.'' If there is no foreseeable danger no injunction was necessary. If there is foreseeable danger adequate relief should have been granted. The boulevard frontage of the land to which the injunctive provisions relate is only about 4,600 feet out of a total of between 15,000 and 20,000 feet of frontage of all the land which was described as tributary to the boulevard. In area it is less than 10 per cent of the tributary lands. The judgment affords plaintiff no measurable protection. Upon the evidence which we have reviewed it is doubtful whether the injunction would be effective even if it were broadened to apply in like terms to the remainder of the tributary area. We do not suggest that any greater relief would be practicable under existing conditions than to extend to all the land that may be found to be tributary to the section of the boulevard in question the same measure of restraint with respect to the opening of new streets as the judgment now grants with respect to a limited area. It is undeniable, however, that any further accumulation of water from newly opened streets in any of the tributary area would increase the danger.

No claim is made by appellant that respondents, Southern Pacific Company and Southern Pacific Railroad Company, are responsible for the conditions which threatened the flooding of its land.

The judgment is affirmed as to the relief which it grants to plaintiff and reversed insofar as it denies further relief.

The court is directed to take further proceedings in accordance with the views herein expressed. Plaintiff is awarded costs of appeal against respondents.

Wood (Parker) J., and Vallée, J., concurred.

A petition for a rehearing was denied April 18, 1951, and the opinion was modified to read as above printed on April 23, 1951. Respondents' and intervener's petitions for a hearing by the Supreme Court were denied May 28, 1951.