THOMPSON, J.
The facts upon which the trial court rendered its decision were stipulated and may be summarized as follows: In 1896 a survey was made, right of way acquired, and a' railroad constructed by defendant Southern Pacific Company’s predecessor from Anaheim to Los Alamitos, passing through what is now known as Stanton, California. Included in the right of way on which the railroad was constructed was a strip of land described in plaintiffs’ complaint, lying southerly of their property. The right of way lying immediately southerly of plaintiffs’ property was in a natural depression in the earth’s surface so that at the time of construction of the roadbed an earth embankment was made which was from 1 to 3 feet higher than the natural ground immediately northerly thereof. This was to provide a level roadway for the tracks. At that time a culvert consisting of two boxes 18 inches high by 30 inches wide and 38% feet long were placed laterally in a north-south direction through the embankment. This facility remained until 1941, when a one-box culvert of similar capacity was substituted in the same flow line. In 1911 a 12-ineh corrugated iron pipe was installed at another point through the right of way in a-north-south direction, and in 1938 the 12-inch pipe was replaced with an 18-inch pipe. In January, February and March of *913 1958 these facilities were in the same location and substantially in the same condition as when installed, and neither was clogged or blocked. There was no natural or artificial watercourse at or near the location of the culvert and the purpose of the same and of the 1911 pipe drain was to pass the surface waters from north of the embankment to the south thereof. At the time of construction they were adequate. At the time of the construction the area north and east of the culverts was devoted almost entirely to agriculture and remained in that condition until the early forties, at which time urbanization commenced, and thereafter houses, including the houses of the plaintiffs, and many business and manufacturing buildings have been constructed, together with paved streets, sidewalks, driveways and parking areas. The natural slope of the land in the vicinity of the premises of plaintiffs was and is in a generally southerly and southwesterly direction, defendant’s land being lower than plaintiffs’, so that the natural flow of surface waters is from the north and northeast in a generally southerly and southwesterly direction toward the land of defendant.
Once in 1952 and several times in 1957 and 1958, but not before 1952, greater quantities of surface waters flowed into the area of plaintiffs’ properties and defendant’s right of way as a result of urbanization and heavy rainfall than did flow in the state of nature and at the time of defendant’s construction. In the months of January, February and March of 1958 the railroad embankment caused surface waters from rain to accumulate and back up and flow across and upon plaintiffs’ property, causing damage. If defendant’s embankment had not been erected and maintained, the surface waters would not have accumulated at this place and upon plaintiffs’ property.
By stipulation the issue of liability was first submitted, and after consideration the trial court determined that under the agreed facts that defendant Southern Pacific Company was liable. Thereafter the parties stipulated as to the amount of damage suffered by each plaintiff, whereupon judgment was rendered in favor of the several plaintiffs and against the defendant Southern Pacific Company in the amounts so stipulated, and from that judgment appeal is taken to this court.
The general rule, of course, is familiar, that a lower owner is bound to receive surface waters naturally flowing to and over his property, that he may not obstruct the same so *914 as to cause them to accumulate and back up on the land of the upper owner. However, the rule is not without qualifications, and it is our belief that the general doctrine must yield to allow changed conditions which come about in the natural growth and development of the community. It is clear that so far as a lower owner is concerned, in certain situations the development of the upper country may bring about an increase of the burden upon his land through having to accept the increased flow occasioned by construction of subdivisions, buildings, streets and so on, above his property. This is in conflict with the general principle that an upper owner may not concentrate or increase the flow of surface waters upon his lower neighbor and is in the general interest of progress and community development. The relaxation of strict application of the basic law relating to the flow of surface waters should be reciprocal and in a proper situation yield in favor of a lower owner who has properly developed his property in the interests of the whole community, as well as in favor of upper owners who, in the interests of progress, are allowed to increase surface water flowing upon lower lands.
In the present situation justice seems to call out very strongly for the application of such a just exception to the general rule. Defendant Southern Pacific Company operated its railroad for more than a half a century before the development of the upper country increased the flow of surface waters to the extent now complained of. At the time of its installation, it provided adequate drainage through its embankment. The railroad was a useful and necessary facility in the general building up of the country. In fact, railroads into new areas must and almost always do precede the coming of people and the building of homes, factories, and the like. On the face of things, it seems rather shocking that in such a situation and after having committed no wrong in the first instance, and having maintained the facility for such a length of time, the plaintiffs, who built their homes with knowledge of the situation, would be in a position to impose liability upon defendant.
We have found no case which we feel can actually be said to be in point and decisive of the case before us. The ease of Weck v. Los Angeles County Flood Control District, 104 Cal.App.2d 599, 600 [232 P.2d 293], involved a somewhat similar factual situation and in our opinion is indicative of the philosophy and of general principles which we feel are applicable and should be followed by us in the present ease. The learned trial judge declined to follow the Weck case on the basis that it *915 involved “flood waters” rather than surface waters. It is difficult from the decision to ascertain just what was the nature of the waters involved in the Week ease and what was the nature of the channel involved. Throughout the opinion, the waters were referred to in various ways as “storm waters,” “storm or flood waters” and “flood waters.” In an earlier opinion involving the same case, found at 80 Cal.App.2d 182, the court at one point referred to the waters in question as “surface waters.” The complaint in the action was for obstructing a “natural water course.” The appellate court held that it was not a water course but found that it was a natural drainage ditch. The waters in question during times of heavy rainfall came down out of a mountain canyon and were carried away by the natural drainage ditch, “wash, ’ ’ or channel in question. We do not believe, therefore, that the waters involved in the Week case were flood waters in the sense of being common enemy and of such a character that a landowner could obstruct the same in such a way as to protect his own property regardless of detriment to his neighbors. As a matter of fact, if the waters in question were “flood waters, ” in a sense 11 enemy waters, ’ ’ in the strict sense, there would have been no problem involved. In the Week ease, the court could have, and would simply have stated that being “enemy” waters there was no liability on the part of the railroad for the diversion. The case of Everett v. Davis, 18 Cal.2d 389 [115 P.2d 821], is authority to the effect that waters such as involved in the Week case were not flood waters in the strict sense of the type against which an owner may protect his land, even to the detriment of his neighbor. At page 393 of the opinion, we find the following language.
“Flood waters are those which escape from a stream or other body of water and overflow the adjacent territory.” (LeBrun v. Richards, supra [210 Cal. 308 (291 P. 825, 72 A.L.R. 336)].) Such waters are said to be a common enemy, against which one may protect his land even to the detriment of his neighbor. But the drastic rule which allows a property owner to divert such waters to the lands of others only applies to flood waters in the strict sense, that is, waters escaping because of their height from the confinement of a stream and running over adjacent property. Implicit in the definition of flood waters is the element of abnormality; they are flood waters because of their escape from the usual channels under conditions which do not ordinarily occur.”
*916 We conclude, therefore, that in the Week case, the waters in question were not flood waters in the strict sense and the case was not decided on the “enemy water” theory and, therefore, that the reasoning of the opinion is applicable in the instant case. Referring to the somewhat similar situation, so far as the defendant railway company was concerned, in the Week case the court stated as follows (p. 608):
“We find it hard to believe that one who constructs an artificial ditch is under an obligation to build it so large and so secure that it will carry all the water that may artificially be diverted into it for all time. On the contrary we think that when an artificial ditch has been in operation for as long as 36 years, as is the case here, it must be held that the original act of diversion is no longer a basis of liability and must be classed as if it has just faded away.”
“While it has been said, particularly in cases decided decades ago, that liability for diversion never ceases, we think it cannot be said to be the rule today. (Cf. Barkley v. Wilcox, 86 N.Y. 140 [40 Am.St.Rep. 519]; 3 Farnham, Waters and Water Rights, 889d, p. 2606.) Moreover, these early cases dealt for the most part with the diversion of streams valuable for their waters. As there is a vital distinction between diverting waters from a watercourse and guarding against storm or flood waters, we turn to expand a bit further on the subject.
11 Since very early times it has been a well-established principle of law that waters flowing in a stream in a natural watercourse through or adjoining a person’s lands could not be diverted by upper landowners to the damage of lower riparian landowners. The reason back of this rule is self-evident.. The pivotal question in every such case has been whether or not there is in fact a watercourse. Hence, the courts were early, compelled to define what was meant by the term ‘watercourse’ and quite naturally held that ‘a water course is a stream of water of such well-defined existence as to make its flow valuable to the owners of land along its course.’ (3 Farnham, Waters and Water Rights, 878, p. 2556, n. 1. See also vol. 2, 459, p. 1562; see also Hellman Commercial Trust & Sav. Bank v. Southern Pac. Co., 190 Cal. 626 [214 P. 46].)
“A natural stream of water, generally speaking, is something of value to lands adjacent to its course. But such a stream when augmented with storm or flood waters is quite the reverse, unless there is a need for such excess waters. Hence, the courts quite naturally held that adjacent landowners along *917 the watercourse were entitled to erect barricades on their lands to prevent storm or flood waters in such a natural watercourse from inundating or otherwise damaging them. This was in no sense a diversion of the waters, but rather an endeavor to confine the waters to their channels.
“From what has been said it is apparent that to speak of Baton’s Canyon Wash as a watercourse is a misnomer, but quite too often the courts have done so because in large measure the rules applicable are the same. But in truth the ‘Wash’ in this case was merely a natural drainage ditch-, i.e., the natural course taken hy storm and flood waters which flowed only more or less periodically. Such waters, being entirely annual and intermittent, possessed no value to lands adjacent to the course they tended to follow, as for instance, a natural ditch created by their more or less periodic flows. [Italics added.]
“Storm or flood waters are not surface waters although before flowing in the channel of a ditch they may have been of that character. ‘The chief characteristic of surface water is its inability to maintain its identity and existence as a water body’ (3 Farnham, Waters and Water Rights, 878, p. 2557, n. 7, citing Gray v. McWilliams, 98 Cal. 157 [32 P. 976, 35 Am.St.Rep. 163, 21 L.R.A. 593]). ‘The weight of authority, as well as of reason, is that flood water is not, and cannot be treated as, mere surface water’ (3 Farnham, Waters and Water Rights, 879, p. 2558). ‘Flood water . . . must be treated as in a class by itself, and it cannot be treated either as a water course or as surface water’ (879, p. 2559, n. 8).”
Again at page 610 we find the following language: “Upon these premises how should storm or flood waters, not flowing as a part of a natural constant stream of water and without value to property owners along the drainage ditch, be treated ? In an endeavor to solve the problem the early decisions in this country accepted the doctrine of “no diversion of waters from a natural watercourse” as being a sufficient and all embracing guide. But those decisions were rendered at a time when the country was largely unsettled or agricultural and not urbanized, as was the case in California in its early days. But we have come upon a new era with new problems which cannot be settled by the laws of nature with respect to the flow of storm and flood waters, where man today is able to block those laws. Storm and flood waters which a century ago could readily have been absorbed by the great open spaces where they normally flowed are now blocked with huge cities and so *918 must seek—in effect—artificial channels as they flow according to the laws of gravity. We should not hold back the normal development and improvements of lands by saying to those who divert natural drainage ditches into artificial ones that liability for diversion never ceases. If at the time of the diversion the artificial channel is adequate to care for all reasonably anticipated storm or flood waters under the then existing conditions of the landscape it should be deemed adequate. There should be no obligation to construct the artificial channel so large and so efficient that it will care for excess storm and flood waters which may flow into it caused by subsequent artificial conditions such as the building of cities and highways which prevent absorption by the lands of such waters and so artificially increase their flow.”
Prom the foregoing, it is apparent that in the Week ease the waters in question were not being treated as “enemy” or flood waters in the strict sense.
It would seem to us then to follow that a similar exception should apply in the ease before us. In fact, the application of an exception to the general rule relating to the flow of surface waters which are mere vagrant waters not having defined channels is less drastic than applying the same sort of exception to the type of waters involved in the Week case.
Obviously, to obstruct the natural drainage ditch such as was permitted in the Week case would be the source of much greater mischief than in the case of the obstructing of mere surface waters as occurred in the case now before us.
This view would seem to be supported by Los Angeles Cemetery Assn. v. City of Los Angeles, 103 Cal. 461 [37 P. 375], where the city of Los Angeles, in the absence of negligence, was held not liable for obstructing the flow of mere surface waters in the construction of a roadway. This is a case establishing an exception to the general rule in favor of a municipality constructing a street which was necessary in the general development of the community. A railroad should be in the same category as a public street.
It would serve no useful purpose to discuss all of the eases that have been cited and considered and to endeavor to reconcile them with our decision. We feel that probably the language of the numerous cases relating to waters flowing on the surface of the earth cannot be reconciled. Part of this is due to loose use of terminology. We do believe, however, that the eases can be pretty well reconciled with reference to the facts of the individual eases. The ease of LeBrun v. Richards, 210 *919 Cal. 308 [291 P. 825, 72 A.L.R. 336], was relied upon by the trial court and the respondent in this case. We would point out, however, in that ease plaintiff and defendant were both still engaged in agriculture, that the obstruction complained of was a fence and embankments along an irrigation ditch which had been of only a few years ’ duration and which presumably could have easily been modified to prevent a continuation of the injury complained of. In that case neither plaintiff nor defendant was a party to the urbanization of the neighborhood. In fact, both were victims of such a development in the land lying northerly and at a higher level than their land. The ease simply held as between the plaintiff and defendant, surface water included not only that which flowed in the course of nature but that which resulted from increased or changed runoff incident to the building of streets, subdivisions and the like on higher ground.
We feel we should briefly mention Gonella v. City of Merced, 153 Cal.App.2d 44 [314 P.2d 124]. That ease may have some language inconsistent with our decision; however, the case was properly decided by reason of the specific finding of the court that defendant railroad was guilty of negligence in that its drainpipe was allowed to become clogged. In the present ease, negligence was pleaded but there is no suggestion of negligence in the stipulated facts and apparently negligence was not considered at the time of the trial or by the trial judge.
The judgment in favor of the plaintiffs and against defendant, The Southern Pacific Company, is reversed.
Costs on appeal are allowed defendant and appellant.
West, P. J., and Crookshank, J., concurred.